THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICHARD SOLHEIM, Defendant-Appellant.

First District (4th Division)   No. 76-12

Opinion filed October 27, 1977.

Joseph Ettinger, of Ettinger and Lake, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Richard Solheim (defendant) and Percy Williams[1] were indicted for robbery, kidnapping, aggravated kidnapping and forcible rape. Following their joint bench trial they were both convicted of forcible rape and were acquitted of the other charges. The defendant, who was sentenced to four to eight years in the Illinois Department of Corrections, has brought this appeal. His contentions are that (1) his guilt was not established beyond a reasonable doubt and (2) he was denied his right to a speedy trial.

We affirm defendant's conviction.

The complainant, Mary Ann Strathmann, testified that in November 1973, following an argument with her boyfriend over whether she should get an abortion, she hitchhiked from California to Indianapolis, Indiana, where she decided to return to California. Her boyfriend wired her money for a flight to Reno, Nevada, which was the closest airport to her home. Strathmann flew to O'Hare Airport in Chicago where she expected to receive additional money by wire from her boyfriend in order to pay for a connecting flight to Reno. Upon her arrival at O'Hare on the morning of November 5, 1973, Strathmann had 87 dollars, which she recalled was insufficient to purchase a ticket to Reno. While waiting for the additional money to arrive she encountered the defendant in a snack bar. He bought her a soda, and, after learning what she was doing, told her he worked for United Airlines and could get her a ticket for two-thirds of the normal fare. Strathmann accompanied the defendant to an elevator in the terminal, believing she was en route to the airline personnel office in the building. In the elevator they encountered Percy Williams who told the defendant he still worked for T.W.A. and who assured Strathmann that the defendant could get her a discount ticket. The three exited the elevator and proceeded to a parking lot, where defendant offered Williams a ride into town. Strathmann was then told that defendant's office was downtown. She expressed reluctance to leave the airport, but when they reassured her that they only wanted to help she got into a car with them. After a 20-minute drive they arrived at an apartment building in Chicago. Strathmann asked why they were stopping. The defendant stated that this was his apartment and he was going to get his checkbook. Again Strathmann was reluctant to accompany them, but upon defendant's assurance that this would facilitate getting the ticket, she entered a second-floor apartment with the two men.

After five to 10 minutes in the apartment, during which time the two men did nothing about getting Strathmann a ticket, she left the apartment and attempted to get her sleeping bag and purse out of the car but was unable to do so because the car was locked. Strathmann testified that she

---

[1]Co-defendant Percy Williams takes no part in this appeal.

needed the purse because it contained identification which she would need in order to get the expected money from Western Union. At about that time Williams came out of the building. He told her that defendant had the car keys and advised her to go talk to him since defendant was then in the process of calling United Airlines about her ticket. She returned to the apartment where defendant was talking to someone on the phone about a ticket to Reno. When he hung up she asked to use the phone to call Western Union. Defendant dialed information for the number and then started to dial it himself. Strathmann said that she wanted to place the call herself. Defendant refused and Strathmann grabbed for the phone so she could hear to whom he was talking. Defendant slapped her and she ran for the door. He grabbed her hair and her arm, dragged her back, and threw her on the sofa so that she was lying on her back. She was screaming and trying to push him off as he sat on her stomach with his knees over her arms and his hand over her mouth. She continued to struggle and attempt to scream for five minutes. Defendant then got off her and she sat up. When defendant appeared to relax she ran for the door. Defendant again grabbed her by her hair and her arm. She screamed and tried to push him away, hitting him, scratching him, and biting his arm in an attempt to get out the door. Defendant pushed her on the floor, covered her mouth and threatened to break her head against the radiator if she made any noise. When he placed his hands on her breasts she again tried to get away, and he told her that he just wanted to see if she would yell so he could break her head. At this point Williams came back in the apartment, asking why she was screaming. Strathmann pleaded with them to allow her to leave. Defendant got off her and began to complain about his $25 shirt which was ripped. Strathmann threw her money on the floor and told them they could have it if they would just let her go. They did not respond to this. She then tried to break the living room window, which led to the ground, by kicking it but she merely bounced off. The two men came towards her and she began kicking at them until she fell down. Williams grabbed her legs and began to unbuckle her buckle and open her pants, while defendant held her mouth against his leg so she couldn't scream. They discussed whether they should burn her with a cigarette which was held under her nose. The two men then ordered her to enter the bedroom. She first refused but then complied when they threatened to break her head. She pleaded with them to leave her alone, telling them she was pregnant and did not want anything to happen to her baby. When she refused to lie on the bed and take off her clothes she was pushed on to the bed by defendant and both men disrobed her. Strathmann was crying and continued to plead with them to leave her alone. Defendant removed his pants and lay down on top of Strathmann. He ordered her to place his penis in her vagina. She

first refused but became afraid when he repeated the order and she then complied. She testified that he penetrated her but did not have an orgasm. Defendant remained on her for about five minutes; Williams remained in the room during the entire incident with the defendant. She then asked for her clothes but was refused and was told to take a shower. Williams took her into the bathroom, handed her a robe when she was done, then left the room. Strathmann put on the robe and went into the living room after observing the defendants there and observing that the front door was bolted. After about 10 minutes defendant left, saying that he would be back at three to get her ticket.

Strathmann pleaded with Williams to let her go but he took her into the bedroom and told her to lie on the bed, which she did. Strathmann was crying and pleading with Williams, still asking him to let her get dressed and leave. Williams undressed and lay on top of her. She tried to get out from under him but was unable to do so. She asked him to stop but he would not. Williams then had intercourse with her, during which he had an orgasm. He then sent her into the bathroom to wash. While she was in the bathroom Strathmann did not attempt to lift or break the window which led to a second-story porch. Nor did she scream for help. Williams then allowed her to dress, telling her that he would take her to a friend's house to get a car. They then went outside, with Williams holding on to her arm. They walked for about two blocks, passing at least one person sleeping in a car, but Strathmann did not scream or attempt to escape. When she saw a bus she broke away and ran onto it. Williams started after her, then turned and walked away. She asked the bus driver to take her to the nearest police station. He took her to one a few blocks away and she ran inside and told the police she had been raped by two men. One of the policemen she talked to was Officer Timothy Twohill. After leading the police to the apartment where the events had occurred she was taken to the hospital.

It was stipulated that if Mary Ann Mohan were called to testify she would testify that a vaginal slide taken from Strathmann contained human sperm.

Officer Twohill testified that on November 5, 1973, he spoke with Strathmann at the station. She was crying, was very nervous and agitated and had trouble speaking. She told him she had been raped by two men. Officer Thomas Stevens also observed that Strathmann was very upset and was crying. They did not observe any injuries on her at that time.

The defendant testified on his own behalf: he and Williams met the complainant at O'Hare. When they learned she did not have enough money for a ticket and was worried about whether her money would arrive, they suggested she investigate getting a youth fare discount. Since she did not expect the money to arrive for some time, and since they told

her they would make calls about a youth fare ticket, she accompanied them back to Williams' apartment. Strathmann left the apartment to get some food and cigarettes and Williams left shortly after she did. When Strathmann returned defendant called United Airlines about a youth fare ticket. After telling the airline he would call back he sat on the couch with Strathmann and talked with her. At this point defendant interrupted his testimony to state that she had earlier told him that she had hitchhiked from Indianapolis to O'Hare and along the way had consented to have intercourse with a drunk who had picked her up. After relating this, defendant testified that he helped Strathmann call Western Union about her money. She then sat close to him on the couch and after a while they went into the bedroom. She removed her shirt and sat on the bed, telling him that he had been nice to her. He began to caress her breasts, touching and kissing them. Her pants were off by this time. When he lowered his head he smelled an horrendous odor coming from her body. He told her she should take a shower and she did so. At that point Williams returned. When Strathmann emerged from the shower in a bathrobe defendant told her he would go and try to get her a discount rate. She gave him the $40 that she had; Williams gave him $35, and defendant left the apartment. He denied ever claiming to be an airline employee; denied ever restraining, striking or having intercourse with Strathmann.

On rebuttal Strathmann identified an airline ticket produced by the State as the one she had purchased at a youth fare rate and had used to fly from Indianapolis to Chicago. Although in her earlier testimony she had referred to the man who wired her money from California as her husband, she admitted on cross-examination that she was not married to him at the time of the incident, and did not marry him until 1974. It was stipulated that on November 5, 1973, the cost of a youth fare card from Chicago to Reno was $87. This was the amount which Strathmann testified she had when she arrived at O'Hare.

I.

■■ Contrary to defendant's argument, we find that the complainant's testimony was clear and convincing and was sufficient in itself to prove the defendant guilty of forcible rape beyond a reasonable doubt. (*People v. Sims* (1972), 5 Ill. App. 3d 727, 283 N.E.2d 906.) Defendant has cited testimony by Strathmann that defendant did not have "intercourse" with her. But her clear testimony was that she was forced to place his penis in her vagina and that he did penetrate her. The context of the cross-examination in which complainant made the statement cited by defendant clearly indicates that she was confused by the questions relating to orgasm, which she had testified defendant did not have, and intercourse. This explanation, given on redirect by the complainant, was

clearly satisfactory to the trial court. We will not disturb that credibility determination on review.

Again, complainant's reluctance to admit to her unmarried status at the time of the incident presented a question of credibility for the trial court. When directly asked, complainant was forthright about her marital status.

Although complainant apparently did in fact have the precise amount of money required for her ticket to Reno, this would have left her with no money at all. Certainly, her attempt to get a cheaper ticket while waiting for more money to be wired does not make her account implausible. Her inexact recollection of this and other details not central to her account of the rape only presented questions of credibility for the trial judge, they did not raise the requirement of corroboration invoked for rape charges unsupported by clear and convincing testimony. (*People v. Williams* (1975), 33 Ill. App. 3d 219, 338 N.E.2d 133.) In any event, complainant's testimony was corroborated by her prompt report of the rapes to the police, and by the medical evidence indicating that intercourse had taken place.

Defendant points to the apparent lack of bruises and cuts on the complainant following the alleged rapes and to the fact that complainant did not cry out or physically resist Williams in his advances after defendant left. Clearly, a rape victim need not subject herself to serious physical harm in warding off her attackers. (*People v. Murphy* (1970), 124 Ill. App. 2d 71, 260 N.E.2d 386.) The complainant testified to sustained vigorous attempts to ward off her attackers and escape when they first made their intentions clear. They overcame her physically without beating her; she was only slapped once according to her testimony. Thus, there was no reason to expect her to be cut or bruised. Nor was she required to continue futile escape efforts once her strength and will were overcome by her attackers. Complainant did in fact seize her opportunity to escape when she was finally allowed outside. While we recognize the special duty of a reviewing court to closely examine the evidence in a rape case, such a conviction will not be overturned unless the finding is so improbable as to cause reasonable doubt as to defendant's guilt. *People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.

## II.

■■ ■ Defendant also contends that he was denied his right to a speedy trial. Under the provisions of the Speedy Trial Act defendant, who had been released on bail, was entitled to trial within 160 days of his demand for trial, provided that delay attributable to him would toll the running of the term and start it anew. (Ill. Rev. Stat. 1975, ch. 38, par. 103—5(b); *People v. Lee* (1969), 44 Ill. 2d 161, 254 N.E.2d 469; *People v. Walker* (1977), 45 Ill. App. 3d 627, 360 N.E.2d 64.) The recently enacted

amendment providing that delay by a defendant suspends the running of the term for the period of the delay is inapplicable here because defendant's alleged offense occurred before the effective date of that amendment, March 1, 1977. Ill. Rev. Stat. 1976 Supp., ch. 38, par. 103— 5(f); *People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776.

The parties agree that the term for defendant, who initially demanded trial on January 9, 1975, was tolled until March 26, 1975 because of delay attributable to defendant. On March 26 the case was continued on the State's motion to May 20, 1975. On that date defendant's attorney was not present. The record reveals that the case was initially passed to await the arrival of defendant's attorney. When defendant's case was again called the following colloquy took place:

"THE COURT: All right, no term on Solheim. Percy Williams—
DEFENDANT SOLHEIM: You say there is no term?
THE COURT: No, no.
DEFENDANT SOLHEIM: My term was broken?
THE COURT: Yes.
DEFENDANT SOLHEIM: Could you explain to me how?
THE COURT: I have been waiting until 3:30 for your attorney.
DEFENDANT SOLHEIM: Could I make a motion to demand trial?
THE COURT: No, no. All right, Solheim it is motion Defendant to July 7 with subpoenas.
A DEPUTY SHERIFF: We have got Percy Williams.
DEFENDANT SOLHEIM: Could I continue without being— you know, hurting myself.
THE COURT: Go ahead.
DEFENDANT SOLHEIM: Well, my attorney is not here. You are breaking my term. I talked to my attorney last night and I expected him to be here.
THE COURT: I know.
DEFENDANT SOLHEIM: He did not show up. How is it my fault?
THE COURT: How can you go to trial without your attorney here?
DEFENDANT SOLHEIM: Well, I am just thinking, can I demand trial in this matter?
THE COURT: See you July 7."

Defendant asserts that the continuance and resulting delay occasioned on May 20 was not properly attributable to him. If this were so the term would have run from March 26, 1975 to September 2, 1975, when the trial commenced, a period computed by defendant to be 161 days. In its brief the State does not contest defendant's computation but rather argues that

the term was tolled on May 20 and commenced anew on the next court date, July 7, 1975. This would bring the computed time well within the statutory limits.

■■ This issue is raised by defendant for the first time on appeal. By failing to apply for discharge prior to his conviction he has waived his right to such discharge. (*People v. House* (1957), 10 Ill. 2d 556, 141 N.E.2d 12; *People v. Browry* (1972), 8 Ill. App. 3d 599, 290 N.E.2d 650.) Defendant's failure to raise the issue in his written post-trial motions and in oral argument on those motions, thus depriving the trial judge of the opportunity to correct the alleged error, provides an additional basis for our finding of waiver. *People v. Neafus* (1976), 39 Ill. App. 3d 365, 353 N.E.2d 68.

While we decide the issue on the basis of waiver, we also note that defendant has incorrectly computed the number of days in his term from the March 26 date which he asserts began that term. Section 1.11 of the construction of statutes act (Ill. Rev. Stat. 1975, ch. 131, par. 1.11) provides in pertinent part: "The time within which any act provided by law is to be done shall be computed by excluding the first day and including the last * * *." This provision is applicable to the Speedy Trial Act. (*People v. Walton* (1969), 110 Ill. App. 2d 115, 249 N.E.2d 170; *People v. Behning* (1970), 130 Ill. App. 2d 536, 263 N.E.2d 607.) Applying this method of computation to the instant case, using the March 26 date urged by defendant, it is evident that he was brought to trial on the 160th day of his term. Thus, even using the starting date for which defendant argues in this appeal, there was no violation of his right to a speedy trial.

■■ Finally, we note that our review of the proceedings of May 20, 1975, establishes that the delay commencing on that date was correctly attributed to defendant. When defendant's attorney did not appear the trial judge first deferred action in the matter until later in the day. When defendant's attorney still did not appear the judge then indicated that defendant's term would be broken. When defendant objected, the trial judge allowed him to speak on the matter. Defendant did not affirmatively demand that trial proceed without his attorney of record; nor did he seek leave to secure another attorney or to have one appointed for him. Indeed, defendant stated that he had spoken to his attorney the night before and fully expected him to appear that day. While defendant did inquire as to whether he could demand trial, the total context of the colloquy indicates that defendant was only concerned with the breaking of his term. While this concern was certainly understandable it cannot be a substitute for a clear manifestation by the defendant of a demand that trial proceed without his attorney of record.

The case of *People v. House* (1957), 10 Ill. 2d 556, 141 N.E.2d 12, which defendant cites involved facts distinguishing it in significant ways from

the case at bar. There the defendant appeared at his arraignment without his lawyer, apparently because that lawyer had not been notified of the court date. The Illinois Supreme Court held that the resulting continuance was improperly attributed to the defendant. In the cause before us defendant has spoken to his attorney the night before and fully expected his appearance in court. In *People v. Williams* (1974), 59 Ill. 2d 402, 320 N.E.2d 849, and *People v. Lewis* (1975), 60 Ill. 2d 152, 330 N.E.2d 857, also cited by defendant, defendants affirmatively demanded immediate trials despite the advice of their attorneys, because their terms had almost run. The defendants in those cases then proceeded to trials in which they were represented by counsel. Those cases only support the proposition that such a choice can be made by a defendant since the choice involved does not violate a defendant's rights. In the case at bar we determine that defendant did not choose to go to trial without his lawyer.

Although it would have been preferable for the trial judge to specifically inquire of the defendant whether he wished to proceed to trial without his attorney, we conclude that defendant did not affirmatively seek that result. The resulting delay caused by the absence of defendant's attorney was properly attributed to the defendant. See *People v. Howard* (1975), 34 Ill. App. 3d 145, 340 N.E.2d 53; *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 979, 29 L. Ed. 2d 136, 91 S. Ct. 1658.

For the foregoing reasons the judgment of the circuit court is affirmed.

JOHNSON and LINN, JJ., concur.