THIRD DIVISION

Filed: 09/24/03

1-02-1205

In re
 John Paul J., a Minor )  Appeal from the

(THE PEOPLE OF THE STATE OF ILLINOIS, )  Circuit Court of 

)  Cook County

Petitioner-Appellee, )

)

v. )  

)

JOHN J., Sr., and ARDELL J., )  Honorable

)  Sandra R. Otaka,

Respondents-Appellants). )  Judge Presiding.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The respondents, John J., Sr. (John J.) and Ardell J., bring the instant appeal from circuit court orders finding that their infant son, John Paul J. is a neglected minor and adjudicating him a ward of the court  For the reasons which follow, we affirm.

John Paul J. was born on June 20, 2001.  On June 26, 2001, the State filed a petition for adjudication of wardship of John Paul J. in which it alleged that he was both a neglected minor pursuant to section 2-3(1) of the Juvenile Court Act (Act) (705 ILCS 405/2-3(1)(a), (b) (West 2000)) and an abused minor as defined by section 2-3(2)(ii) of the Act (705 ILCS 405/2-3(2)(ii) (West 2000)).  That same day, the trial court appointed the public guardian to serve as John Paul J.'s guardian 
ad
 
litem
 and conducted a temporary custody hearing.  After the parties presented their evidence, counsel for the respondents moved to dismiss the case.  Counsel asserted that the Department of Children and Family Services (DCFS) had taken temporary protective custody of John Paul J., not at 3:29 p.m. on June 25, as alleged in the State's petition for adjudication of wardship, but on June 21 when John Steele, a child protective investigator employed by the DCFS, instructed personnel at the hospital where John Paul J. was born not to release the child to the respondents' care.  Counsel argued that, as the temporary custody hearing was not conducted within 48 hours of the child having been taken into protective custody, as required by section 2-9 of the Act (705 ILCS 405/2-9 (West 2000)), the trial court lacked jurisdiction.  The trial court denied the motion.  It went on to find that probable cause existed to believe that John Paul J. was neglected and awarded temporary custody of the child to D. Jean Ortega Piron, Guardianship Administrator of the DCFS.  The court then granted the State leave to amend the petition for adjudication of wardship by adding allegations that John Paul J. was a neglected minor as defined under section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2000)) in that his environment was injurious to his welfare.

An adjudicatory hearing was held over a period of several dates commencing on September 26, 2001, and concluding on October 26, 2001.  The following evidence was presented at the hearing.

At the State's request, the trial court admitted into evidence court orders pursuant to which the respondents' daughters Sapphire J. and Jasmine J. were found to be  neglected minors in that their environment was injurious to their welfare and adjudicated wards of the court.  The orders regarding Sapphire J. were entered in 1997, and the orders regarding Jasmine J. were entered in 1998.  Also admitted into evidence were court orders, entered in 1994, pursuant to which Ardell J.'s children Krystle D. and Joshua D. were adjudicated dependent minors in that they were without proper care because of the physical or mental disability of their parent and adjudged wards of the court.  Additionally, Ardell J.'s medical records from MacNeal Hospital, where John Paul J. was born, were admitted.

The State presented the testimony of Dr. John Murray, a clinical psychologist who conducted a psychological evaluation of Ardell J. in May and June of 2000.   Dr. Murray testified that this evaluation consisted of interviewing Ardell J. on two occasions and reviewing "numerous records and reports," including records from the DCFS, Ardell J.'s school records, reports from Catholic Charities and Hepzibah Child Protection Agency, a parental capacity evaluation, and records from the Fillmore Center, MacNeal Hospital, and the Illinois Department of Public Health.  In addition, Ardell J. completed the Minnesota Multiphasic Personality Inventory test.

Dr. Murray testified that he diagnosed Ardell J. as suffering from major depression, alcohol abuse, and cocaine abuse, all of which were in remission at the time of his evaluation.  He also diagnosed her as having learning disabilities and borderline personality disorder.  According to Dr. Murray, he based his diagnosis of borderline personality disorder on the following symptoms exhibited by Ardell J., as revealed during his interviews with her or by information in her records: unstable relationships with various people in her life; unstable and somewhat extreme mood and emotional presentation; extremely limited insight into the motivation for her behavior; and impulsive behavior.  Dr. Murray characterized Ardell J.'s borderline personality disorder as severe, noting that her symptoms had spanned a period of years and she had required four periods of psychiatric hospitalization and experienced suicidal thoughts at different points in her life.  Dr. Murray stated that a person suffering from borderline personality disorder has a great deal of difficulty managing her self-esteem and anger and that "impulsive behaviors, and a stronger degree and presence of experience of anger, presents a risk for *** parenting children."  According to Dr. Murray, a person with a diagnosis of severe borderline personality disorder "could" put a minor child at risk.  He explained that "[i]mpulsivity and anger and caring for young children are just not a good or safe match."  When asked what steps a parent with such a diagnosis would need to take to ensure that she did not pose a risk to her child, he responded that such a person would have to "develop more sophisticated and mature ways to cope and to fend from their emotion."  Dr. Murray stated that the only way he knows of to accomplish this is to actively participate in intensive psychotherapy over an extended period of time.  To Dr. Murray's knowledge, at the time he evaluated Ardell J., she had not participated in such therapy.  At the time of his evaluation, Dr. Murray formed the opinion that Ardell J. was not able to adequately or safely parent a child and that her inability to parent was likely to continue into the foreseeable future.  The doctor testified that borderline personality disorder is a chronic disorder and, in the absence of any treatment, its symptoms will persist.  If Ardell J. had not participated in any psychotherapy since the time of the evaluation, his opinion regarding her inability to parent would remain unchanged.

The State also called Rosemary Spizzirri, a social worker employed by Catholic Charities, to testify.   Spizzirri testified that she is familiar with the respondents as she "supervised the case" from October 1999 through May 2001.  Spizzirri testified that the case file revealed that the respondents had completed a parenting evaluation, John J. had completed a drug and alcohol assessment, and Ardell J. had undergone a court-ordered psychological evaluation.  Although John J.'s drug assessment indicated that he needed to participate in substance abuse services, there was no documentation in the file that he had done so.  Also, although the file contained documentation showing that Ardell J. obtained counseling in 1994 and 1995 with regard to Jasmine and Sapphire J.'s cases, there was no documentation that she did so after the parenting evaluation was performed.

Spizzirri testified that, in November 1999, she spoke with the respondents by telephone and explained to them that, as the goal for their last child had been changed from "return home" to "substitute care pending termination of parental rights," Catholic Charities would no longer pay for counseling or other services but would still assist them by referring them to agencies which could provide such services.   According to Spizzirri, she also told John J. that his wife needed mental health treatment and that, if he so requested, Catholic Charities would review the record in order to refer him to substance abuse treatment services if necessary.  The respondents did not contact Catholic Charities after that conversation.

On April 18, 2001, Spizzirri visited the respondents' home with their caseworker.  During that visit, Spizzirri discussed with the respondents various matters regarding their children Jasmine and Sapphire J.  Ardell J. told Spizzirri that she had engaged in some unspecified services when the case was being handled by another agency.  Spizzirri informed Ardell J. that she must provide documentation thereof.  Spizzirri explained Dr. Murray's diagnosis to Ardell J. and told her that she should contact the Fillmore Center, an agency which provides mental health services on a sliding fee scale, to schedule an appointment. She also discussed a past substance abuse evaluation with John J. and informed him that he would need to submit to random drug screenings and would probably need to undergo another substance abuse evaluation.  According to Spizzirri, John J. informed her that he had been "clean for a good period of time" and that he would be happy to submit to another substance abuse evaluation and to drug screenings.  Spizzirri testified that she questioned John J. regarding his claim to be "clean," pointing out that there was a small pipe made out of tin foil in an ash tray in the home.  Based on her experience of working with substance abusers, Spizzirri believed this to be drug paraphernalia.  According to Spizzirri, John J. told her that he used the pipe to smoke tobacco.  On cross-examination, Spizzirri acknowledged that she is not an expert on drug paraphernalia.

Spizzirri next saw the respondents on May 3, 2001, at which time they told her they had not engaged in counseling or any other services since her April visit to their home.  Ardell J. also stated that she had not contacted the Fillmore Center to initiate the intake process for counseling.  According to Spizzirri, during the entire time she was assigned to the respondents' case, Ardell J. never provided her with documentation that she was seeing a psychiatrist or psychologist, that she was in therapy, or that she made an appointment at the Fillmore Center.  John J. never provided her with any documentation that he had completed random drug screenings or attended substance abuse treatment.  Spizzirri had not been in contact with the respondents since May 2001.

The State next called  John Steele, a DCFS worker, to testify.  Steele was assigned to John Paul J.'s case on June 20, 2001, after the DCFS hotline received a call regarding the child.  On June 21, 2001, Steele went to MacNeal Hospital, where he saw the child and met with the respondents.  The interaction he observed between the respondents and John Paul J. on that date appeared to be appropriate.  According to Steele, the respondents appeared to be quite upset and stated that no one was going to take their child from them.  Ardell J. stated that "she was going to leave with the child." As of that date, Steele testified, he believed the case would probably be handled by assigning "an intact person" to offer appropriate assistance to the family.  Steele was considering this option because the respondents stated they would be willing to cooperate with the DCFS by participating in whatever services the agency recommended and he had no real reason to believe that John Paul J. would be at risk.  Several days later, though, Steele received a telephone call from Kimberly Waters, a friend of the respondents, who reported that Ardell J. stated she intended to flee the state with the child.  Waters also told Steele that Ardell J. had been drinking.  According to Steele, this information led him to believe that John Paul J. was at risk of harm.  He took temporary protective custody of the child on June 25, 2001, based upon the respondents' prior history with the DCFS and concerns that the respondents would flee the state with the child.

After the State rested, the trial court allowed the public guardian to publish for the record portions of Ardell J.'s medical records from MacNeal Hospital pertaining to the birth of John Paul J. which stated that Ardell J. received insufficient prenatal care and drank alcohol during her pregnancy.  The public guardian then rested.

The respondents called Waters to testify.  Asked the nature of her relationship with the respondents, Waters testified that she provides childcare for their four older children.  Waters testified that, after John Paul J. was born, Ardell J. was asked to develop a "safety plan" as to how she would care for the child.  As part of that plan, Ardell J. needed someone to assist her financially and by providing child care.  Steele telephoned Waters and asked if she would be willing to provide Ardell J. with assistance as part of the safety plan, and Waters agreed.  Several days after John Paul J. was born, Waters telephoned Steele and informed him that she had spoken to Ardell J. on the telephone after her release from the hospital and that Ardell J. stated that she did not intend to follow through with the safety plan.  Waters denied telling Steele that Ardell J. sounded as if she had been drinking or expressed an intention to leave the state with the child.

The respondents next called Assistant Public Guardian Colleen Flaherty.  Flaherty testified that she is familiar with the respondents because, since 1997, she had been representing Sapphire J. and Jasmine J.  Flaherty did not recall the respondents having participated in any services with regard to Jasmine and Sapphire.    According to Flaherty, during the time that she had been assigned to represent the respondents' older children, Ardell J. had been very uncooperative and hostile.  Before John Paul J. was born, however, Ardell J. called Flaherty and asked what she would need to do to retain custody of the baby after his birth.  She believed Ardell J. was sincerely willing to take the steps necessary to retain custody of her baby.  Therefore, when Steele first contacted her prior to the temporary custody hearing, she told him that, in her opinion, the DCFS should open an "intact family case" and offer assistance to the respondents.  Around June 25, 2001, Flaherty received a voice mail message from Waters.  Waters stated that she was no longer willing to participate in the safety plan for John Paul J., that the respondents had "been partying," and that Ardell J. stated that she would take the child out of state.  Based upon the information she received from Waters and unspecified information she received from John Paul J.'s maternal grandmother, Flaherty no longer recommended that the family remain intact.

Ardell J. testified that she had five children, including John Paul J.   In 1993, two of her children were "placed into the system" and she was assigned a caseworker.  She underwent a psychological assessment and a parenting assessment and attended individual counseling.  Ardell J. further testified that she attended a support group for parents from 1993 to 1997.  According to Ardell J., the DCFS took custody of her third and fourth children in 1996 and 1997, respectively. Ardell J. was assigned a caseworker with respect to these cases.  She testified, however, that this caseworker did not offer to arrange for her to participate in counseling or other services with regard to either case. 

Ardell J. testified that, in 1996, she signed forms consenting to the adoption of two of her children.  She did so in order to get the children "out of the system" and so that she could be part of their lives "without having to deal with the courts."  Subsequently, she signed forms consenting to the adoption of her other two children.

According to Ardell J., on April 15, 2001, she learned that she was pregnant with John Paul J.  Thereafter, Ardell J. spoke with Avril Riley, a caseworker employed by the DCFS and assigned to the case of two of her children.  According to Ardell J., Riley told her that, if she made an attempt to obtain counseling and attend parenting classes before John Paul J.'s birth, there was a good chance she may be able to retain custody of and raise the child herself.   Ardell J. contacted the Fillmore Center in May 2001 to find out when the next parenting class began and was told there was a short waiting list.  She enrolled in the class in June 2001 and completed it on June 27, giving a copy of the certificate documenting her completion of the class to Riley.  Ardell J. testified that she attempted to enroll in counseling sessions before John Paul J.'s birth, but an employee at the Fillmore Center told her that she could not do so because she "did not have a current assigned case."  According to Ardell J., she was able to register for counseling sessions after the DCFS took temporary protective custody of John Paul J.  She was then placed on a waiting list at the Fillmore Center and started the counseling sessions two weeks prior to the date of her testimony.  Ardell J. stated that, in addition to attending counseling, she was willing to take any other actions recommended by the DCFS.

The respondents' counsel then published portions of Ardell J.'s medical records which showed, 
inter
 
alia
, that, during her stay in the hospital, personnel assessed mother and infant bonding to be "within normal limits."

During closing arguments, the respondents' counsel renewed the motion to dismiss the petition for adjudication of wardship for a lack of jurisdiction on the basis that the temporary custody hearing was not conducted within 48 hours of the DCFS taking John Paul J. into temporary protective custody.  The trial court denied the motion.  It found that the State had proven by a preponderance of the evidence that John Paul J. is a neglected minor in that his environment was injurious to his welfare, stating that it had carefully assessed the credibility of the witnesses and often found that Ardell J.'s testimony was not credible.  The trial court continued the case for a dispositional hearing.

On December 6, 2001, the trial court commenced the dispositional hearing and continued the matter to April 1, 2002.  At the conclusion of the hearing on that date, the trial court found that the respondents were unable and unwilling to care for John Paul J.  It adjudicated the child a ward of the court and appointed Ortega Piron his guardian.  The respondents then initiated the instant appeal.

On appeal, the respondents argue that: (1) the trial court erred in denying their motion to dismiss the petition for adjudication of wardship; (2) the trial court failed to comply with the statutory requirements as to the time frame during which an adjudicatory hearing must be held and, as a result, its adjudication and disposition orders are void and must be vacated; (3) the petition for adjudication of wardship of John Paul J. is legally insufficient to allege neglect; and (4) the trial court's order finding John Paul J. to be a neglected minor is against the manifest weight of the evidence and, as a result, both its adjudication order and subsequent disposition order should be vacated.

We first address the respondents' argument that the trial court erred in denying their motion to dismiss the petition for adjudication of wardship because the temporary custody hearing was not held within 48 hours of the DCFS taking temporary protective custody of John Paul J.

Section 2-9 of the Act provides that, once a minor is taken into temporary protective custody, he must be brought before a judicial officer within 48 hours for a temporary custody hearing.  705 ILCS 405/2-9(1) (West 2000).  It further provides that:  "The minor must be released from temporary protective custody at the expiration of the 48 hour period specified by this Section if not brought before a judicial officer within that period."  705 ILCS 405/2-9(3) (West 2000).

The respondents contend that the DCFS took protective custody of John Paul J. on June 20, 2001, rather than on June 25 as the State alleged, and that, accordingly, the temporary custody hearing conducted on June 26, 2001, was not held within the requisite 48 hour period.  The State and the public guardian contend that the trial court's factual determination that the DCFS took temporary protective custody of the minor on June 25, 2001, is supported by the evidence and should not be disturbed.  We need not determine the propriety of the trial court's factual finding in this regard because the failure to conduct a temporary custody hearing within the requisite 48 hour period does not deprive the trial court of jurisdiction.  See 
People v. Clayborn
, 90 Ill. App. 3d 1047, 1051, 414 N.E.2d 157 (1980) (holding that the trial court's failure to conduct a temporary custody hearing within the time frame mandated by a predecessor version of section 2-9 of the Act did not deprive the court of personal jurisdiction over the minor).  Further, the Act clearly states that the remedy for the failure to conduct a temporary custody hearing within 48 hours of the minor being taken into temporary protective custody is the release of the minor from custody.  705 ILCS 405/2-9(3) (West 2000);  705 ILCS 405/2-10(7) (West 2000).  See also 
Clayborn
, 90 Ill. App. 3d 1047 (this court ruled that the remedy for violation of provision, in a predecessor statute, that temporary custody hearing be held within a certain time is release of the minor from custody).  The respondents did not seek the release of John Paul J. from custody, seeking instead the dismissal of the petition for adjudication, a remedy for which the Act does not provide.  Accordingly, we reject the respondents' contention that the trial court erred in denying their motion to dismiss the petition.

We now turn to the respondents' contention that the trial court did not conduct the adjudicatory hearing within the time frame set forth in section 2-14 of the Act and that, as such, its adjudication order and subsequent disposition order are void and must be vacated.  At the time the adjudicatory hearing in the instant case took place, section 2-14 of the Act provided in relevant part as follows 
(footnote: 1)  :

"(b) When a petition is filed alleging that the minor is abused, neglected or dependent, an adjudicatory hearing shall be held within 90 days of the date of service  of process upon the minor, parents, any guardian and any legal custodian.

(c) Upon written motion of a party filed no later than 10 days prior to hearing,  or upon the court's own motion and only for good cause shown, the Court may continue the hearing for a period not to exceed 30 days, and only if the continuance is in the best interests of the minor. * * *  Only one such continuance shall be granted.  A period of continuance for good cause, as described in this Section shall temporarily suspend as to all parties, for the time of the delay, the period within which a hearing must be held.  On the day of the expiration of the delay, the period shall continue at the point at which it was suspended.

* * * If the adjudicatory hearing is not heard within the time limits required by subsection (b) or (c) of this Section, upon motion by any party the petition shall be dismissed without prejudice."  705 ILCS 405/ 2-14 (West 1994).

In support of their contention that we must vacate the trial court's orders of adjudication and disposition, the respondents rely on 
In re S.G.
, 175 Ill. 2d 471, 677 N.E.2d 920 (1997).  In 
In re S.G.
, the respondent mother filed a motion to dismiss the State's petitions for adjudication of wardship of her four children because the adjudicatory hearing had not been conducted within the time frame set forth in section 2-14 of the Act.  The trial court conceded that the time requirements of section 2-14 had not been met but, nonetheless, denied the motion, finding that dismissal of the petitions would not be in the best interests of the children.  The Illinois Supreme Court, construing the language of section 2-14 of the Act, rejected the State's argument that the word "shall" as used in subsection (c) should be interpreted as directory rather than mandatory.  The supreme 
court determined "that the legislature intended a mandatory construction of section 2-14 and that the adjudicatory hearing must be completed within the statutory period."  
In re S.G.
, 175 Ill. 2d at 483.  

The respondents in this case assert that service upon all parties was completed on June 26, 2001, the date they appeared in court for the temporary custody hearing.  Noting that the adjudicatory hearing commenced 92 days later on September 26, 2001, they assert that, not only was the hearing not completed within 90 days of service of process, it was not even commenced during the 90 day period.  The respondents acknowledge that the version of section 2-14 in effect at the time of the adjudicatory hearing in the instant case allows for the trial court to grant a one-time continuance of 30 days or less upon a finding of good cause, and thereby extend the maximum permissible time period for the completion of the hearing to 120 days from the date service upon the parties is completed.  They assert, however, that the trial court here improperly continued the case more than once.  The respondents also note that the adjudicatory hearing was not completed until October 26, 2001, 122 days after service upon them had been effectuated.  The respondents argue that the trial court was required to dismiss the petition for adjudication of wardship because the adjudicatory hearing was not completed within the requisite statutory time limitations and that, as a consequence, the trial court's order of adjudication and its subsequent dispositional order are void.

The State and the public guardian raise a number of arguments in opposition to the respondents' contention that the petition for adjudication of wardship should have been dismissed because the time requirements of section 2-14 of the Act were not satisfied.  We begin by addressing their assertion that the respondents waived this contention by failing to file a motion to dismiss the petition as required by section 2-14(c).  For purposes of addressing the waiver argument, we will assume that service of process upon all parties was completed on June 26, 2001, as the respondents assert.

Section 2-14 of the Act makes clear that the parties can waive the statutory time limits set forth therein as subsection (d) provides that:  "The time limits of this Section may be waived only by consent of all parties and approval by the court."  705 ILCS 405/2-14(d) (West 1994); 
In re V.Z.
, 287 Ill. App. 3d 552, 558, 678 N.E.2d 1070 (1997).  In 
In re S.G.
, our supreme court addressed and rejected the public guardian's assertion that the respondent mother in that case had waived her right to a prompt adjudicatory hearing, observing that the respondent, through her attorney, had repeatedly voiced her frustration at the slow pace of the proceedings.  
In re S.G.
, 175 Ill. 2d at 484-85.  We find the instant case to be distinguishable from 
In re S.G.
 in this regard.

On August 14, 2001, the trial court in this case scheduled an adjudicatory hearing for September 26, 2001.  As stated above, September 26, 2001, is 92 days after June 26, 2001.  The respondents made no objection to the court's scheduling of the hearing for September 26.  On September 26, 2001, the hearing was commenced but not completed.  The trial court asked if the parties would agree to "waiving the 90 days," and counsel for the respondents indicated that they would not.  The trial court then stated that "this is the 90
th
 day" and found good cause to continue the case to October 18, 2001.  The respondents 
did not object to the good cause continuance.  On October 18, 2001, the trial court heard additional evidence and then asked the respondents' counsel whether they would waive the 90 day limit, to which counsel responded that they would not.  The court continued the case to October 22, 2001, for the completion of the hearing.  On October 22, 2001, the trial judge to whom the case was assigned was not present.  The parties agreed to continue the case to October 23, 2001, for the assignment of a date to complete the hearing.  On October 23, 2001, the trial judge was present and the parties agreed to schedule the matter for Friday, October 26, 2001.  When the trial judge asked if there was "any speedy trial issue" that needed to be addressed, counsel for the respondents stated: "I think, judge, the 30
th
 day expires on Friday, so I think we're still within the time limits."  On October 26, 2001, the adjudicatory hearing was completed and the trial court entered an order finding John Paul J. to be a neglected minor.

Although the respondents twice declined to waive the 90 day time limit contained in section 2-14, the record reflects that the respondents never filed a motion to dismiss the petition for adjudication of wardship of John Paul J. on the ground that the adjudicatory hearing was not conducted within the statutory time limit.  Section 2-14(c) provides that: "If the adjudicatory hearing is not heard within the time limits required by subsection (b) or (c) of this Section, 
upon motion by any party
 the petition shall be dismissed without prejudice."  [Emphasis added.] 705 ILCS 405/2-14(c) (West 1994).  In 
In re S.G.
, the case upon which the respondents here rely, the respondent mother did, in fact, file a motion to dismiss the petitions for adjudication of wardship of her four children.  
In re S.G.
, 175 Ill. 2d at 477.  In 
In re S.W.
, No. 1-02-0962 (Ill. App. July 31, 2003), decided subsequent to
 In re S.G.
, the respondent mother argued for the first time on appeal that the trial court lacked statutory authority to proceed where the adjudicatory hearing was not completed within the requisite time period.  Citing the above-quoted language of section 2-14(c), this court held that the respondent had waived the issue by failing to move, either orally or in writing, to dismiss the petition for adjudication of wardship.  
In re S.W.
, No. 1-02-0962, slip op. at 11-12.  See also 
People v. Solheim
, 54 Ill. App. 3d 379, 386, 369 N.E.2d 308 (1977) (defendant waived claim that his constitutional right to a speedy trial had been violated where he raised issue for first time on appeal).  As in 
In re S.W.
, we find that the respondents have waived any objection as to the timeliness of the adjudicatory hearing by failing to move for dismissal of the petition for adjudication of wardship on this basis.  Due to this finding, we need not address the remaining arguments which the State and the public guardian raise with respect to this issue.

We now turn to the final issue which the respondents have raised on appeal, which consists of assertions that the petition for adjudication of wardship is legally insufficient to allege that John Paul J. is a neglected minor interspersed with assertions that the trial court's finding that he is a neglected minor is against the manifest weight of the evidence.

The State and the public guardian argue that the respondents have waived any claim as to the sufficiency of the allegations contained in the petition for adjudication of wardship.  Other than delinquency proceedings, where the liberty of a minor is at stake, proceedings under the Act are governed by the general rules of civil practice; the provisions of the Code of Civil Procedure (Code) (735 ILCS 5/2-101 
et
 
seq
. (West 2000))  apply unless the Act specifically governs the procedure at issue.  
In re A.B.
, 308 Ill. App. 3d 227, 234, 719 N.E.2d 348 (1999).  Section 2-612(c) of the Code provides that "[a]ll defects in pleadings, either in form or substance, not objected to in the trial court are waived."  735 ILCS 5/2-607 (West 2000).  Only where a pleading wholly and absolutely fails to state any cause of action can an objection be raised for the first time on appeal.  
Inland Real Estate Corp. v. Lyons Savings & Loan
, 153 Ill. App. 3d 848, 854-55, 506 N.E.2d 652 (1987); 
Oberman v. Byrne
, 112 Ill. App. 3d 155, 159, 445 N.E.2d 374 (1983).  If the complaint states a cause of action, no matter how defectively or imperfectly alleged, and no objection thereto is raised in the trial court, then the defect is cured by judgment and cannot be challenged on appeal.  
Pieszchalski v. Oslager
, 128 Ill. App. 3d 437, 444, 470 N.E.2d 1083 (1984).  We have reviewed the allegations of the petition and find that they are sufficient to reasonably inform the respondents as to the nature of the neglect charge.  Because we cannot say that the petition for adjudication of wardship in this case wholly and absolutely failed to state a cause of action, we agree with the State and the public guardian that the respondents have waived any challenge to the sufficiency of the pleadings by failing to raise this issue in the trial court.

We are left with the respondents' claim that the trial court's finding that John Paul J. is a neglected minor is against the manifest weight of the evidence.  Here, the trial court found that John Paul J. is a neglected minor by reason of the fact that his environment is injurious to his welfare.

Generally speaking, neglect is the failure to exercise the care justly demanded by the circumstances and encompasses both willful and unintentional disregard of parental duties.  
In re M.K.
, 271 Ill. App. 3d 820, 826, 649 N.E.2d 74 (1995).  The term is not, however, one of fixed meaning but, rather, takes its content from the particular circumstances of each case.  
In re M.K.
, 271 Ill. App. 3d at 826.  Similarly, the term "injurious environment" is an amorphous concept which cannot be defined with any particularity, and each case involving a finding of neglect on the basis of injurious environment must be reviewed in light of the specific circumstances thereof.  
In re M.K.
, 271 Ill. App. 3d at 826.  The State bears the burden of proving neglect by a preponderance of the evidence.  
In re J.P.
, 331 Ill. App. 3d 220, 234, 770 N.E.2d 1160 (2002).

The respondents argue that there was no evidence introduced at the adjudicatory hearing that they neglected John Paul J. but that, rather, the trial court improperly inferred that they would neglect him from the fact that they had other children who had been the subject of proceedings under the Act.  They contend that the fact that they had other children who had been in the custody of the DCFS does nothing to prove neglect of John Paul J.  The respondents further maintain that the fact that Ardell J. has been diagnosed with borderline personality disorder is insufficient to establish neglect in the absence of any evidence of some act or omission with regard to John Paul J. resulting from the condition.  The respondents note that the evidence established that, prior to John Paul J.'s birth, Ardell J., on her own initiative, had herself placed on a waiting list for parenting classes, which she attended after the child's birth and that, at the time of the adjudicatory hearing, she was also attending counseling sessions.

In support of their argument that the trial court's finding that John Paul J. is a neglected minor is against the manifest weight of the evidence, the respondents rely on 
In the Interest of Baby Boy Butt
, 76 Ill. App. 3d 587, 395 N.E.2d 1 (1979),
 and 
In re Edricka C.
, 276 Ill. App. 3d 18, 657 N.E.2d 78 (1995).  We find their reliance to be misplaced as those cases are factually distinguishable from the instant case.  Unlike in 
In the Interest of Baby Boy Butt
 or 
In re Edricka C.
, 
there was medical evidence in the instant case that the respondent mother suffers from severe borderline personality disorder, which impairs her ability to parent.  Dr. Murray testified that borderline personality disorder is characterized by impulsive behavior and a great deal of anger which "presents a risk for *** parenting children."  He opined that, as of the time he evaluated Ardell J. in May and June of 2000, she was not able to safely and adequately parent and testified that, if she had not received intensive psychotherapy since that time, his opinion in this regard would remain unchanged.  There was no evidence that Ardell J. participated in psychotherapy after Dr. Murray's evaluation.  While Ardell J. testified that she had completed parenting classes after John Paul J.'s birth and had begun counseling two weeks prior to her testimony at the adjudicatory hearing, she provided no documentation to support this claim.  Further, there was no evidence that the counseling to which she referred was the type of intensive psychotherapy which Dr. Murray recommended or that this brief period of counseling had resulted in any improvement in her condition.  Although Ardell J. testified that she was willing to participate in any other services which the DCFS recommended, the evidence showed that she had a history of not following through with past recommendations. Additionally, Waters testified that, after John Paul J.'s birth, Ardell J. stated she did not intend to comply with the terms of the safety plan she had developed with Steele for the child's care.  As for John J., the evidence showed that he had never participated in the substance abuse services which had been previously recommended and Spizzirri testified that, on April 18, 2001, just months before John Paul J.'s birth, she saw what she believed to be drug paraphernalia in the respondents' home.  Viewing the evidence presented at the adjudicatory hearing in its totality, we conclude that the trial court did not abuse its discretion in finding that John Paul J. is a neglected minor in that his environment is injurious to his welfare.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

SOUTH and HALL, JJ., concur.

FOOTNOTES
1:  
Effective January 1, 1998, section 2-14 was amended to provide that an adjudicatory hearing must be "commenced," rather than "held," within this 90 day period.  On September 1, 2001, however, the Illinois Supreme Court declared the public act effecting this amendment to be unconstitutional.  See 
People v. Sypien
, 198 Ill. 2d 334, 345, 763 N.E.2d 264 (2001).