Sixth Division
April 18, 2008

No. 1-07-2785

| | | |
|---|---|---|
| In re R.S., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County |
| Respondent-Appellee | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | 07 JA 00143 |
| | ) | |
| v. | ) | |
| | ) | |
| L.S., | ) | |
| | ) | Honorable |
| Respondent-Appellant). | ) | Maxwell Griffin, Jr., |
| | ) | Judge Presiding |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Respondent, L.S., appeals the September 2007 juvenile court order that adjudicated her minor son, R.S., to be neglected due to an injurious environment and dependent because of the physical or mental disability of respondent. Following this adjudication, the trial court conducted a dispositional hearing and found that it was in R.S.'s best interest and welfare to be adjudged a ward of the court because respondent was unable to care for R.S.

On appeal, respondent argues that the trial court's findings that R.S. was neglected based on an injurious environment were against the manifest weight of the evidence.

R.S. was born on March 8, 2007. On March 15, 2007, the State filed a petition for adjudication of wardship on behalf of R.S., alleging that R.S. was neglected, abused, and dependent pursuant to subsections 2-3(1)(b), 2-3(2)(ii) and 2-4(1)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b), (2)(ii), 2-4(1)(a) (West 2006)). The petition stated the

following facts in support:

> "Mother has four other minors who are or were in DCFS
>
> [Department of Children and Family Services] custody with
>
> findings of abuse, neglect, dependency, and/or unfitness having
>
> been entered. Mother has five prior indicated reports for risk of
>
> harm and failure to thrive. Mother has a history of mental health
>
> issues which have negatively affected her ability to parent.
>
> Paternity has not been established."

On March 15, 2007, the trial court took temporary custody of R.S. without prejudice and found that probable cause existed that R.S. was abused, neglected, and dependent. On May 16, 2007, the trial court made a paternity finding that J.A. is the natural father of R.S.

On June 21, 2007, the trial court conducted a temporary custody rehearing. Following the testimony from Wanda Boyd-Gunn, a child protective investigator with DCFS, and Brenna Brady, Child Serve program supervisor, the trial court found that probable cause existed that R.S. was abused, neglected, and/or dependent.

The adjudication hearing was held on September 5, 2007. Boyd-Gunn testified that she was assigned to R.S.'s case on March 12, 2007, following a hotline call indicating a risk of harm for R.S. As part of her investigation, Boyd-Gunn discovered that respondent had four prior indicated cases with DCFS for failure to thrive and risk of harm.[1] The dates of the indicated cases

---

[1] Under the Abused and Neglected Child Reporting Act, if an investigation determines that credible evidence of the alleged abuse or neglect exists, an "indicated report" is made. 325 ILCS 5/3 (West 2006).

were from 1991, 1997, 1998, and 2004.

She contacted Lakeisha Murdaugh, a case manager at Child Serve assigned to R.S.'s case. Murdaugh informed Boyd-Gunn that she was currently monitoring one of L.S.'s other children. Murdaugh told her that this was "an open case and that mother has several reports from therapists that indicate that she is not able to parent and some that indicate that she may be able to parent one day." Murdaugh also said that "mother had followed through with recommended services but it still didn't prevent risk of harm to [R.S.]"

Boyd-Gunn testified that prior to the temporary custody hearing, she spoke with the natural father, J. A., about possible relatives that could take R.S. and prevent him going into DCFS custody. J.A. indicated that he lived with respondent, but was willing to leave the home if needed. However, Boyd-Gunn said that to her knowledge J.A. has not left the home.

Lakeisha Murdaugh testified that she is the case manager for R.S. with Child Serve. She is also the case worker for two of respondent's other children, M.S. and G.S. Murdaugh stated that respondent has five children in addition to R.S. Respondent's parental rights have been involuntarily terminated as to two of her children. She was assigned to the cases for M.S. and G.S. in September 2006. The current status for M.S. was subsidized guardianship and the status for G.S. was "substitute care pending termination of parental rights." Murdaugh has never been able to recommend unsupervised visitation with G.S. At the time Murdaugh spoke with Boyd-Gunn, respondent was participating in individual therapy, vocational training and parent/child visitation.

Murdaugh supervised approximately one parental visitation with G.S. a month. G.S. was

3

two years old during the subject visitation. Two of the visits Murdaugh supervised were inappropriate. At the October 2006 visit, Murdaugh observed G.S. as being "all over the place, throughout the apartment" while respondent appeared to be "oblivious of what he was doing." At one point, G.S. got on top of a radiator and Murdaugh had to say something to respondent for her to redirect him. At a March 2007 visitation, G.S. was not "receptive to visitation." Respondent tried to get G.S. to focus on the visitation by yelling. Respondent also "would hold him and shake him inappropriately" to force G.S. to look at her.

Murdaugh also expressed concern over the company respondent has in her home during visitation. During an October 2006 visit, Murdaugh saw a person in the home with a tear drop on his face, which Murdaugh's experience indicated a gang symbol. Additionally, a neighbor of limited intellectual functioning was allowed to come in and out of respondent's unit. Murdaugh noted that visitation was later moved to respondent's sister's house.

Murdaugh testified that she has concerns about respondent's ability to parent G.S. and R.S. because respondent "appears to have a limited level of intellectual functioning, appears to have poor insight, she appears to have poor judgment and poor problem solving skills." Murdaugh said that on prior case assignments, respondent has completed a psychological assessment, a parenting capacity assessment, an adult substance abuse screen, and a parenting class. However, when asked if respondent was making significant enough progress in services to eliminate the risk of harm to R.S., Murdaugh answered, "no."

Murdaugh's opinion is based on her own observations as well as a psychological evaluation dated March 1, 2006, and a parenting capacity assessment. These reports were

admitted as exhibits. The purpose of the psychological evaluation was "to determine [respondent's] intellectual, emotional and social functioning as it reflects on her current and foreseeable capacity to parent her child." This evaluation was completed by Bill Moor, Psy.D., Ph.D. Dr. Moor reviewed previous psychiatric and psychological evaluations done in 1993 and 1995 as well as the parenting capacity assessment from 2005.

Dr. Moor made numerous findings and diagnosed respondent with attachment disorder, adjustment disorder with mixed anxiety and depressive moods, schizotypal personality disorder with dissociative and concrete circumstantial thinking and mild mental retardation. The evaluation also included an IQ test and Dr. Moor indicated that respondent's full scale IQ was 67. Respondent's IQ had declined since her previous evaluation, which found her full scale IQ at 73. This decline indicated a general mild intellectual decline over the past 10 years.

In his recommendations, Dr. Moor found:

> "The present evaluation cannot support a return of [respondent's] child to her care. Despite her best efforts and intentions, she does not have the intellectual capacity to provide for the care and safety of a child or to utilize supportive services to augment her having responsibility for the care and safety of a child. She would not be able to identify when such resources should be turned to, especially if the situation is acute and unexpected."

Dr. Moor concluded:

> "Hopefully [respondent's] sincere struggle is reflected and

respected, however, the well-being of the child should not be
reduced to a learning experience for [respondent,] particularly so
because the present assessment indicates that she is not capable of
'learning' what is need [*sic*] in terms of the basic emotional and
intellectual pre-requisites of good enough parenting."

The parenting capacity assessment was prepared by Thresholds Mothers' Project Parenting Assessment Team in June 2005. The assessment was done at the request of DCFS to "evaluate the parenting competency of [respondent,] clarify issues with regard to pertinent mental health issues, provide an external source of input regarding progress toward the goals of the current service plan, and generate additional recommendations regarding current or proposed services." This evaluation included a review of respondent's history with her children and DCFS dating back to 1993.

The report indicated that respondent's capacity was limited and she had "poor insight."

"She constantly blames others for different issues, which makes it
hard to tease out whether it is part of her mental limitation or the
personality disorder traits. *** It is hard to predict how
appropriately she would respond to her child's needs if she flips
from reality to a dream like state. *** It is possible that her poor
judgment and distorted reality prevent her from realizing her
behavior is not appropriate.

***

[Respondent] has been able to maintain consistent housing for several years, as well as part-time employment, which suggests that she is able to function independently when solely responsible for her self. However, given her limitations as well as her involvement with several idiosyncratic and exploitative street people, it is not likely that she could function independently when caring for her child. There is no question that she loves him and would like to be a part of his life, yet her commitment to achieving this, as well as her ability to do is limited. This circumstance is very unlikely to change, as [respondent] lack ths self-awareness needed to recognize and modify the serious issues that have persisted over several years and five of her children."

The State also admitted into evidence the adjudication orders, dispositional orders and/or termination hearing orders for respondent's other children. M.S., born November 30, 1991, was adjudged neglected due to lack of care and injurious environment on January 19, 1994, and was adjudged a ward of the court on May 25, 1994. V.L., born March 4, 1997, was adjudged dependent as being without care because of the physical or mental disability of the parent on August 12, 1997, and on September 18, 1997, he was adjudged a ward of the court. On May 6, 2003, respondent's parental rights were terminated as to V.L. C.S., born September 11, 1998, was found abused and neglected on January 20, 1999, and adjudged a ward of the court on March 4, 1999. On November 21, 2000, respondent's parental right to C.S. were terminated. G.S.,

born June 5, 2004, was found to be dependent as being without care because of the physical or mental disability of the parent and adjudged a ward of the court on February 10, 2006.

Following arguments, the trial court held R.S. to be abused and neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2006)) and dependent as being without care because of the physical or mental disability of the parent (705 ILCS 405/2-4(1)(b) (West 2006)). The court found:

> "The case law is clear the court doesn't have to wait until a child is injured or actually abused or is actually neglected to find the child is at risk of that and that environment is injurious to the minor.
>
> ***
>
> With respect to the natural mother the evidence is unrebutted that there are prior indicated reports. The evidence is unrebutted that there is a child presently in the Department of Children and Family Services care wherein reports have been done.
>
> Capacity assessments in June '05 and a psychological report in March '06, I believe, that at least raised the issues as to the natural mother's ability. That combined with the testimony of the current case worker relative to her observations and opinions in that regard have, again, gone unrebutted in terms of the State's sustaining their burden of proof that there is, at this point, serious questions of the mother's ability to parent, the child."

The dispositional hearing was held on the same day. Murdaugh testified again. She stated that respondent was in need of services through "NEA," which is an agency to assist people with developmental disabilities. Respondent was going through the intake process with NEA at the time of the dispositional hearing. Respondent also should continue with individual therapy and parent/child visitation.

Murdaugh spoke with respondent's therapist. Respondent consistently has been attending her individual therapy sessions, but her therapist indicated to Murdaugh that respondent was "making minimal progress, if any." The therapist expressed concerns whether respondent "was able to understand what they were doing in therapy based on her limitation." The referral to NEA was made to help respondent with a different service.

Murdaugh said the natural father, J.A., was in need of services, including substance abuse services because he tested positive for cocaine following two random urinalysis screenings.

Murdaugh recommended that R.S. be adjudged a ward of the court because of the "possible risk, the questionable judgment, the question about the safety and the environment."

The trial court adjudged R.S. a ward of the court and found that respondent and J.A. were unable to care for R.S. and it was in R.S.'s best interest to be removed from the care of his parents.

This appeal followed.

On appeal, respondent argues that the trial court's finding at the adjudication hearing that R.S. was neglected due to an injurious environment was against the manifest weight of the evidence.

"[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." In re Arthur H., 212 Ill. 2d 441, 463 (2004). It is the State's burden to prove allegations of neglect by a preponderance of the evidence. In re Arthur H., 212 Ill. 2d at 463-64. In other words, the State must establish that the allegations of neglect are more probably true than not. In re Arthur H., 212 Ill. 2d at 464. On appeal, a trial court's ruling of neglect will not be reversed unless it is against the manifest weight of the evidence. In re Arthur H., 212 Ill. 2d at 464. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. In re Arthur H., 212 Ill. 2d at 464. Further, "due to the 'delicacy and difficulty of child custody cases,' it is well settled ' "that wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." ' " In re Lakita B., 297 Ill. App. 3d 985, 994 (1998), quoting In re D.L., 226 Ill. App. 3d 177, 185 (1992), quoting In re Martin, 31 Ill. App. 3d 288, 293 (1975).

We point out that respondent's notice of appeal indicates that she is appealing the trial court's adjudication of neglect and dependency, but she failed to raise the court's finding of dependency in her brief. "Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." 210 Ill. 2d R. 341(h)(7). Since respondent has waived review of the trial court's finding of dependency, we affirm the trial court's adjudication that R.S. is a dependent minor.

Respondent contends that there was no factual basis for the trial court's finding of neglect because R.S. has never been in respondent's custody and never had the opportunity to abuse or

neglect R.S. The State and R.S. respond that there was sufficient evidence presented to support the trial court's finding based on respondent's history of mental health issues that have impacted her ability to parent since 1993.

"The concept of 'neglect' is not static; it has no fixed and measured meaning, but draws its definition from the individual circumstances presented in each case." In re J.P., 331 Ill. App. 3d 220, 234 (2002). "Generally, 'neglect' is defined as the ' "failure to exercise the care that the circumstances justly demand." ' " In re Arthur H., 212 Ill. 2d at 463, quoting In re N.B., 191 Ill. 2d 338, 346 (2000), quoting People ex rel. Wallace v. Labrenz, 411 Ill. 618, 624, 104 N.E.2d 769 (1952). Neglect also encompasses " ' "wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." ' " In re Arthur H., 212 Ill. 2d at 463, quoting In re N.B., 191 Ill. 2d at 346, quoting Labrenz, 411 Ill. at 624.

Similarly, "[n]eglect based on 'injurious environment' is a similarly amorphous concept not readily susceptible to definition." In re J.P., 331 Ill. App. 3d at 234. Generally, "the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " In re Arthur H., 212 Ill. 2d at 463, quoting In re N.B., 191 Ill. 2d at 346, quoting In re M.K., 271 Ill. App. 3d 820, 826 (1995).

"In any hearing under this Act, proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2006). Sibling abuse may be *prima facie* evidence of neglect based upon an injurious environment, but this presumption

11

weakens over time and can be rebutted by other evidence.  In re J.P., 331 Ill. App. 3d at 235.

"There is no *per se* rule of anticipatory neglect in Illinois, and each case concerning the

adjudication of minors must be reviewed according to its own facts."  In re J. P., 331 Ill. App. 3d

at 235.  "To determine whether a finding of anticipatory neglect is appropriate, the trial court

should consider the current care and condition of the child in question and not merely the

circumstances that existed at the time of the incident involving the child's sibling."  In re J.P., 331

Ill. App. 3d at 235.  Nevertheless, "when faced with evidence of prior neglect by parents, 'the

juvenile court should not be forced to refrain from taking action until each particular child suffers

an injury.' "  In re Arthur H., 212 Ill. 2d at 477, quoting In re Brooks, 63 Ill. App. 3d 328, 339

(1978).

Respondent relies on the decision in In re Edricka C., 276 Ill. App. 3d 18 (1995), as

support for her assertion that evidence of past sibling abuse is by itself insufficient to show abuse

and neglect are imminent for R.S.  In that case, petitions for adjudication of wardship were filed

for minors Edricka C., born in 1992, and Zemaj C., born in 1991, based on allegations that the

mother did not seek proper medical treatment for Edricka.  At trial, the State offered evidence

relating to two prior encounters with DCFS in 1987 and 1989.  The 1987 case involved

allegations that the parents severely beat their oldest child, while the 1989 case arose when a fire

broke out in the apartment building where the mother's other five children were left unsupervised.

At the time of the hearing, the mother had supervised visits with her oldest child and unsupervised

visitation with the other children.  The DCFS employee, who had been involved with the mother's

family from 1990 until 1993, acknowledged that Edricka and Zemaj had lived with their mother

without incident until the filing of the petitions and she had not previously brought the subject minors into court because she did not believe they were at risk. In re Edricka C., 276 Ill. App. 3d at 20-21.

The trial court entered findings of " 'neglect care necessary, environment injurious, and substantial risk of physical injury' " for both minors based on the theory of anticipatory neglect. In re Edricka C., 276 Ill. App. 3d at 24. "The court explained that even though these minors were originally brought before it on medical neglect allegations, 'the court cannot ignore the prior history of this mother and father with their children and dismiss petitions on these two infants.' " In re Edricka C., 276 Ill. App. 3d at 24-25.

On appeal, the reviewing court reversed the trial court's findings. The court found that under the circumstances of the case, "evidence of past sibling abuse is admissible, but, by itself, insufficient to show that abuse and neglect are imminent" for Edricka because the record showed that Edricka had been in perfect health, the mother sought and completed counseling services, the DCFS employee testified that the minors were not at risk, and the mother had begun parenting classes. In re Edricka C., 276 Ill. App. 3d at 29-30. The appellate court made similar findings for Zemaj and noted that "the trial court's findings concerning Zemaj come too close to a *per se* rule of anticipatory neglect." In re Edricka C., 276 Ill. App. 3d at 31.

The circumstances surrounding R.S.'s neglect adjudication are very different from those present in In re Edricka C. While respondent correctly states that the prior findings occurred in 1991, 1997, 1998, and 2004, she fails to acknowledge the fact that the 2004 case involving G.S. was ongoing at the time of the adjudicatory hearing. The 2005 parenting capacity assessment and

the 2006 psychological evaluation were prepared in the course of G.S.'s case.

Here, the adjudications for respondent's children, including R.S., are based on respondent's long-standing mental health issues, not specific occurrences as in In re Edricka C. The evidence submitted by the State and R.S. shows that respondent has been diagnosed with attachment disorder, adjustment disorder with mixed anxiety and depressive moods, schizotypal personality disorder with dissociative and concrete circumstantial thinking and mild mental retardation. The documents stated that these circumstances are unlikely to change. Murdaugh testified that respondent's therapist indicated that she was making minimal progress in therapy. No one testified that respondent was able to care for R.S. Murdaugh also discussed inappropriate behavior by respondent during her supervised visitation with G.S. in October 2006 and March 2007. Murdaugh stated that in the October 2006 visit, respondent was "oblivious" to two-year-old G.S. and when G.S. climbed on top of a radiator, she did not redirect him until prompted by Murdaugh. At the March 2007 visit, respondent yelled and shook G.S. in an attempt to focus his attention on her. We point out that the inappropriate March 2007 visitation took place less than three weeks after R.S. was born.

The facts in the instant case are similar to those present in In re John Paul J., 343 Ill. App. 3d 865 (2003). There, the minor, John Paul, was taken into protective custody shortly after birth in June 2001 and the State filed a petition for adjudication of wardship. At the adjudicatory hearing, evidence was presented that the natural mother had been diagnosed with learning disabilities and borderline personality disorder. A doctor recommended intensive psychotherapy to treat the mother's illness. The evaluating doctor opined that at the time of the evaluation, the

14

natural mother "was not able to adequately or safely parent a child and that her inability to parent was likely to continue into the foreseeable future." In re John Paul J., 343 Ill. App. 3d at 869.

The State also admitted evidence of court orders for the natural parents' four other children who had been adjudged wards of the court in 1994, 1997 and 1998. The 1994 orders were based on an adjudication that the subject minors were dependent in that they were without proper care because of the physical or mental disability of their parent while the 1997 and 1998 adjudications were based on a finding of neglect in that their environment was injurious to their welfare. In re John Paul J., 343 Ill. App. 3d at 868.

Additional evidence showed that the natural father had substance abuse issues, but he asserted that he was "clean." A social worker had recommended that the natural mother seek counseling and that the parents had completed parenting classes. The natural mother testified that she had begun counseling shortly before the adjudicatory hearing. A DCFS employee testified that John Paul was taken into custody after a friend of the parents informed him that the natural mother was threatening to take the child and flee the state. In re John Paul J., 343 Ill. App. 3d at 871. The trial court concluded that the State had proven by a preponderance of the evidence that John Paul was a neglected minor in that his environment was injurious to his welfare. In re John Paul J., 343 Ill. App. 3d at 873.

On appeal, the parents argued that "there was no evidence introduced at the adjudicatory hearing that they neglected John Paul J. but that, rather, the trial court improperly inferred that they would neglect him from the fact that they had other children who had been the subject of proceedings under the Act." In re John Paul J., 343 Ill. App. 3d at 879. As the respondent in the

instant case, the parents relied on the decision in In re Edricka C. for support. The reviewing court found their reliance to be misplaced because "there was medical evidence in the instant case that the respondent mother suffers from severe borderline personality disorder, which impairs her ability to parent." In re John Paul J., 343 Ill. App. 3d at 880. The court affirmed the trial court's judgment based in part on the evidence of the natural mother's mental health issues, her failure in the past to follow through with DCFS recommendations, and the natural father's failure to participate in substance abuse services. In re John Paul J., 343 Ill. App. 3d at 880.

In the present case, it is unrebutted that respondent suffers from ongoing and well-documented mental health issues, including a schizotypal personality disorder, an attachment disorder and mild mental retardation. Respondent's psychological evaluation indicated that her full scale IQ is 67, which is a decrease from a previous evaluation. Although respondent has been participating in recommended services, including therapy and parenting classes, case workers and therapists have said that she is making minimal progress and is not able to effectively parent. As the parenting capacity assessment stated, "There is no question that she loves him and would like to be a part of his life, yet her commitment to achieving this, as well as her ability to do so, is limited." We find that the State submitted sufficient evidence to satisfy its burden to show that R.S. is a neglected minor, and the trial court's finding was not against the manifest weight of the evidence.

Finally, we note that in respondent's notice of appeal, she stated that she is appealing the court's disposition order that she was unable to parent the children in addition to the adjudication order. However, in her argument, she failed to address the court's dispositional ruling. "Points

16

1-07-2785

not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." 210 Ill. 2d R. 341(h)(7). Accordingly, respondent has waived review of the trial court's dispositional order, and we affirm the dispositional ruling.

Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

O'MALLEY and McNULTY, JJ., concur.