2026 IL App (4th) 260045-U

NOS. 4-26-0045, 4-26-0047, 4-26-0049, 4-26-0051, 4-26-0053 cons.

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 8, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.R., Shy. R., Sham. R., J.R., and Shan. R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | Nos. 25JA67 |
| v. | ) | 25JA68 |
| Tiffany R., | ) | 25JA69 |
| Respondent-Appellant). | ) | 25JA70 |
| | ) | 25JA71 |
| | ) | |
| | ) | Honorable |
| | ) | Norma Kauzlarich, |
| | ) | Judge Presiding |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding (1) the trial court's neglect findings were not
against the manifest weight of the evidence and (2) its dispositional orders were
not an abuse of discretion.

¶ 2    In August 2025, the State filed petitions for adjudication of wardship regarding

T.R. (born February 2008), Shy. R. (born January 2014), Sham. R. (born May 2015), J.R. (born

May 2017), and Shan. R. (born November 2021), the minor children of respondent mother,

Tiffany R. The trial court granted the petitions, adjudicating T.R. abused and neglected and the

remaining children neglected and making them wards of the court. Tiffany appealed.

¶ 3                                          I. BACKGROUND

¶ 4    On August 6, 2025, the State filed petitions for adjudication of wardship,

asserting T.R., Shy. R., Sham. R., J.R., and Shan. R., should be made wards of the court. The petitions alleged T.R. was neglected and abused pursuant to sections 2-3(1)(b) and 2-3(2)(i) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b), (2)(i) (West 2024)), and Shy. R., Sham. R., J.R., and Shan. R. were neglected pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2024)).

¶ 5        The petitions alleged the Illinois Department of Children and Family Services (DCFS) received a report alleging Tiffany "battered [T.R.] and left her stranded on the highway without a phone or means of communication." A DCFS investigator interviewed T.R. at the hospital where she was receiving treatment for her injuries. T.R. reported Tiffany became angry when she observed T.R. closing the car door on her sibling. Tiffany "verbally assaulted [T.R.] and then started striking her mouth and head repeatedly." T.R.'s four younger siblings, Shy. R., Sham. R., J.R., and Shan. R., were in the vehicle, along with M.G., their foster sibling. Tiffany continued to batter T.R. while driving. During the incident, Tiffany was having a phone conversation with T.R.'s father, Morrio R., who "heard what was occurring but did not say anything." Tiffany ultimately stopped the vehicle, took T.R.'s shoes and phone, and told T.R. to " 'get the fuck out of the car.' " Tiffany drove away, leaving T.R. on the side of the interstate.

¶ 6        T.R.'s face, arms, and hands were bloodied, her eyes were bloodshot, and her eyes and face were swollen. Eventually, another driver stopped, picked up T.R., and took her to the hospital. Tiffany was subsequently arrested and charged with domestic battery in Rock Island case No. 25-DV-157.

¶ 7        DCFS took protective custody of T.R. and placed her in relative foster care on August 5, 2026. Morrio agreed to care for the other children and ensure Tiffany "was not living in the family home or having unsupervised contact with the children." Morrio indicated he would

obtain an emergency order of protection against Tiffany, but the order was denied when Morrio and Tiffany "appeared in court together and indicated that they were seeking the order because DCFS made them do so." When another DCFS investigator visited the family home to discuss moving the other children to relative foster care, Morrio began yelling at T.R., blaming her for their predicament.

¶ 8        After a hearing, the trial court granted the children's temporary custody to DCFS.

¶ 9        On August 15, 2025, a protective order, signed by Morrio, was submitted to the trial court. The court approved and signed the order, confirming with both parents that Tiffany "would stay away from these kids and from [Morrio] as long as [Morrio] has them." The court vacated the temporary custody orders for Shy. R., Sham. R., J.R., and Shan. R., and permitted them to return to Morrio's care. T.R.'s temporary custody remained with DCFS.

¶ 10        At the adjudicatory hearing, Sergeant Joseph Miletich of the Silvis Police Department testified he spoke to Tiffany after the events in question occurred. According to Tiffany, T.R. "had tried to fight her." Tiffany asserted she observed T.R. "slamming the car door on one of the younger siblings." Tiffany and T.R. got into a verbal argument, which escalated into physical violence. Tiffany told Miletich that T.R. "was trying to jump out of the vehicle" as she was driving. When Miletich asked how T.R. exited the vehicle, Tiffany answered, " 'I put her out.' " When asked why she did not report the altercation to law enforcement, Tiffany said "she didn't want to get [T.R.] into trouble." When Miletich interviewed Tiffany, she was unaware of T.R.'s whereabouts. After Miletich informed her that T.R. was in the hospital, Tiffany did not ask how T.R. got there, nor did she indicate she attempted to look for T.R. Miletich did not observe any injuries on Tiffany's body.

¶ 11 Miletich conducted a phone interview with T.R., who said the altercation began when she closed the car door on her younger sibling, which upset Tiffany. Tiffany told T.R. that she was "going to beat her ass," and she "struck [T.R.] in the face." T.R. hit back, and she "crawl[ed] onto the floor of the passenger side as [Tiffany] continued to hit her." Tiffany "kicked [T.R.] out of the car" at a "no U-turn area" on the highway, and a passerby picked her up and took her to the hospital.

¶ 12 Kristin Bruns, a DCFS child protection specialist, testified DCFS received a hotline call on August 3, 2025, alleging T.R. was in the hospital after "being battered by her mother" and suffering "bone fractures and head injuries." Bruns attended an interview with T.R., during which she observed T.R.'s nose was swollen and her eyes "were completely bloodshot to the point there was [*sic*] no whites in either eye." T.R. "appeared very sad and defeated." T.R.'s recounting of the events in question largely mirrored her statements to Miletich. On the same day, Bruns interviewed J.R., Shy. R., and Sham. R., all of whom corroborated T.R.'s statements. Bruns's efforts to interview Shan. R. and M.G. were unsuccessful.

¶ 13 When Bruns spoke with Tiffany, Tiffany stated, "[T.R.] was trying to fight her." Morrio asserted he was at work when Tiffany called him, saying, " '[T]his girl is trying to fight me.' " Morrio insisted he had "nothing to do with the situation." Morrio believed the altercation "was a mutual fight" between Tiffany and T.R.

¶ 14 T.R. subsequently indicated she no longer felt safe in Morrio's home, and Bruns spoke with Morrio and T.R. Morrio expressed confusion, insisting he had "never done anything to [T.R.] to make her feel unsafe." Bruns testified that during the conversation, Morrio became upset with T.R. and yelled at her, blaming T.R. for the family's predicament. T.R. responded by telling Morrio to look at her face and reminding him that her injuries were not self-inflicted.

¶ 15　　　　The trial court found, "[T]he State has met its burden of proof, that it is in the best interest of the children that they be made wards of the Court." However, the court determined all the children except T.R. would stay with Morrio pursuant to the protective order, and the court appointed DCFS as T.R.'s guardian. The court reiterated, "Everything is going to remain the same for now. Until the dispositional hearing, everything stays the same." The court entered a written order finding T.R. was abused and neglected and the younger children were neglected.

¶ 16　　　　On December 9, 2025, Lutheran Social Services of Illinois (LSSI) filed a dispositional hearing report, which recommended the children be retained as wards of the court. The report recommended T.R. remain in traditional foster care and the younger children remain with Morrio. The report recommended T.R.'s permanency goal be changed to independence, as she was going to turn 18 in a few months and she "expressed that she does not have a desire to return home or be in communication with her parents at this time."

¶ 17　　　　LSSI also filed an integrated assessment, which recommended Tiffany, *inter alia*, complete anger management and parenting classes, engage in individual and family psychotherapy, maintain stable income and housing, and sign consents for treatment records. The agency remained concerned about Tiffany's "parenting practices, impulse control, and capacity to maintain appropriate boundaries during periods of heightened stress." Tiffany exhibited "limited expression of remorse and insight into the seriousness of the incident," which suggested a lack of accountability or emotional awareness.

¶ 18　　　　On January 8, 2026, LSSI filed a status alert, notifying the trial court that Tiffany had completed domestic violence services, an anger management program, and parenting classes. Tiffany had not yet begun her recommended psychotherapy.

¶ 19        At the dispositional hearing on January 29, 2026, the trial court took judicial notice of the dispositional hearing report, integrated assessment, and status alert. The State rested on the report. Tiffany told the court she was "going to be working with the agency" to complete the recommended psychotherapy. Tiffany agreed with the report's recommendation that T.R.'s permanency goal should be independence. The court approved the integrated assessment's recommendations pertaining to Tiffany. The court determined T.R. would remain a ward of the court and her goal would be independence. The court found the younger children would remain wards of the court and stay in Morrio's care.

¶ 20        The trial court entered a dispositional order finding Tiffany was unable to care for, protect, train, or discipline the minors because she needed to complete the recommended services. The order found the service plan and its recommendations appropriate, and it sent a permanency goal of independence for T.R. and reunification for the younger children.

¶ 21        This appeal followed.

¶ 22                            II. ANALYSIS

¶ 23        On appeal, Tiffany argues (1) the trial court's neglect findings regarding Shy. R., Sham. R., J.R., and Shan. R. were against the manifest weight of the evidence and (2) its orders making the younger children wards of the court were not supported by an adequate factual basis. Tiffany does not challenge the court's judgments regarding T.R. We affirm.

¶ 24                        A. Standard of Review

¶ 25        The Act provides the two-step process trial courts follow when determining whether to make a minor a ward of the court. See *In re A.P.*, 2012 IL 113875, ¶ 18; 705 ILCS 405/2-18, 2-22 (West 2024). During the first step, the court conducts an adjudicatory hearing to identify whether the minor is abused, neglected, or dependent. See 705 ILCS 405/2-18(1) (West

- 6 -

2024). If so, the court must then conduct a dispositional hearing to decide whether it is in the best interest of the minor to be made a ward of the court. See 705 ILCS 405/2-22(1) (West 2024). When making its determination, the court will consider "whether the parents *** are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so," as well as whether "the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of the minor's parents." 705 ILCS 405/2-27(1) (West 2024).

¶ 26    "The paramount consideration in proceedings under the Act is the best interests of the child." *In re J.T.*, 2024 IL App (1st) 232041, ¶ 67. The trial court is best positioned to determine a child's best interests, and we afford such decisions "broad discretion and great deference." *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). "[A] dispositional order entered in a proceeding under the [Act] is a matter committed to the sound discretion of the court." *In re Beatriz S.*, 267 Ill. App. 3d 496, 500 (1994). "The court's decision will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." *In re J.W.*, 386 Ill. App. 3d 847, 856 (2008). "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 27                                    B. Neglect Findings

¶ 28    First, Tiffany asserts the trial court erred in finding Shy. R., Sham. R., J.R., and Shan. R. were neglected. "Generally, neglect is defined as the failure to exercise the care that the

- 7 -

circumstances justly demand." (Internal quotation marks omitted.) *In re R.S.*, 382 Ill. App. 3d 453, 460 (2008). "Neglect also encompasses wilful as well as unintentional disregard of duty." (Internal quotation marks omitted.) *R.S.*, 382 Ill. App. 3d at 460. "[T]he term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). In any hearing under the Act, "proof of the abuse, neglect or dependency of one minor shall be admissible evidence on the issue of the abuse, neglect or dependency of any other minor for whom the respondent is responsible." 705 ILCS 405/2-18(3) (West 2024). "[W]hen faced with evidence of prior neglect by parents, 'the juvenile court should not be forced to refrain from taking action until each particular child suffers an injury.' " *Arthur H.*, 212 Ill. 2d at 477 (quoting *In re Brooks*, 63 Ill. App. 3d 328, 339 (1978)).

¶ 29    The evidence showed Tiffany battered T.R. in front of the younger children before eventually kicking her out of the vehicle on the side of the interstate without a cell phone or shoes. After the altercation, T.R.'s eyes were bloodshot, her eyes and face were swollen, and her face, arms, and hands were bloodied. According to the integrated assessment, there were ongoing concerns regarding Tiffany's parenting practices and impulse control. Tiffany expressed limited remorse for her actions or appreciation for the seriousness of the altercation, which demonstrated a lack of accountability or emotional awareness. That lack of accountability persisted throughout the proceedings below, as Tiffany repeatedly asserted T.R. instigated the altercation. On appeal, Tiffany insists that "[t]he evidence reflected a mutual altercation," further demonstrating a lack of accountability. We are not interested in who started the fight—our concern lies with the children's best interests. See *J.T.*, 2024 IL App (1st) 232041, ¶ 67. The evidence presented was sufficient to demonstrate Tiffany failed to exercise the care demanded by

the circumstances, and she failed to provide her children with a safe and nurturing environment. See *R.S.*, 382 Ill. App. 3d at 460; *Arthur H.*, 212 Ill. 2d at 463. Accordingly, the court's neglect findings were not manifestly erroneous because the opposite conclusion was not clearly evident. See *A.P.*, 2012 IL 113875, ¶ 17.

¶ 30                                    C. Dispositional Orders

¶ 31         Second, Tiffany argues the trial court's dispositional orders making Shy. R., Sham. R., J.R., and Shan. R. wards of the court and placing their guardianship with DCFS were not supported by an adequate factual basis. Tiffany fails to cite any authority supporting this argument, and she references a small portion of the evidence in the record in the most general terms. The irony is not lost on us.

¶ 32         During the dispositional hearing, "the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. [Citation.] At this point, the trial court may consider the acts and/or omissions of the parents." *In re Z.L.*, 2021 IL 126931, ¶ 60. According to the dispositional hearing report, the younger children were initially removed from Morrio's care due to concerns regarding his minimization of the altercation and his failure to demonstrate protective factors. Although they were eventually returned to his care, and Tiffany was granted supervised contact, the report recommended Tiffany and Morrio complete several services to achieve reunification. Considering the circumstances leading to the minors being taken into care in the first place, the court's recommendations were very reasonable. Tiffany did not object to any of the report's recommendations, and Morrio only objected to the recommendation that he complete mental health services. The court approved the report's recommendations, with the exception of Morrio's mental health treatment requirement, and made all five children wards of the court. The

younger children remained with Morrio, while T.R. remained in her foster placement. The court set independence as T.R.'s goal and reunification as the younger children's goals. Ensuring minimal compliance before returning the children to the unfettered supervision of their parents was not unreasonable. Based on the record before us, we cannot say the court's dispositional orders were an abuse of discretion, as they were not arbitrary, fanciful, or unreasonable. See *Beatriz S.*, 267 Ill. App. 3d at 500; *McDonald*, 2016 IL 118882, ¶ 32.

¶ 33                                         III. CONCLUSION

¶ 34          For the reasons stated, we affirm the trial court's judgment.

¶ 35          Affirmed.