2022 IL App (5th) 220134-U

NO. 5-22-0134

NOTICE

Decision filed 08/02/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-JA-47 |
| | ) | |
| Jerry C., | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's findings that respondent was unfit, and termination of his parental rights was in the child's best interest, were not against the manifest weight of the evidence.

¶ 2    The respondent, Jerry C., appeals the judgments of the Vermilion County circuit court finding him unfit pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)), and that it was in the best interest of the minor child to terminate his parental rights. On appeal, he argues both findings were in error. We disagree and, for the following reasons, affirm the trial court's orders.

1

¶ 3                    I. BACKGROUND

¶ 4     Jerry and Haley are the biological parents of J.C., born March 27, 2018. Jerry and Haley's

relationship began in May 2017. Two months later, the Illinois Department of Children and Family

Services (DCFS) opened an investigation related to claims of inadequate supervision of Haley's

other children and domestic violence between the couple.[1] The family was referred for intact

services. In October 2017, Haley obtained an order of protection against Jerry. When the couple

later reconciled, the order of protection remained in force, and Jerry was arrested for violating the

order of protection on April 20, 2018.

¶ 5     On May 3, 2018, the State filed a petition for adjudication of wardship that alleged,

*inter alia*, that J.C. was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act

of 1987 (705 ILCS 405/2-3(1)(b) (West 2018)) in that the minor's environment was injurious to

his welfare because Jerry and Haley engaged in domestic violence in front of the minor placing

him in physical and emotional danger. On May 11, 2018, the trial court found probable cause and

temporary custody was placed with DCFS. Following the adjudicatory hearing on July 9, 2018,

the trial court found the allegations in the petition were proven.

¶ 6     Jerry's integrated assessment was performed on July 18, 2018. At that time, Jerry was

incarcerated and awaiting transport to the Illinois Department of Corrections (IDOC) after

receiving a sentence of 18 months following his conviction for violating the order of protection.

The assessment required Jerry to release his mental health records, participate in psychological

counseling, domestic violence offender services, and interactive parenting services prior to

reunification. The assessment noted that Jerry signed up and paid for domestic violence services

---

[1]Neither Haley, nor her two other children, are subject to this appeal. The information related to
Haley and her other children is provided only as background for this case.

in 2018 but never attended. The assessment further noted that Jerry's actual incarceration would be less than 18 months, and therefore Jerry would likely be ineligible for services while incarcerated.

¶ 7     Jerry was granted parole in December 2018 and was provided a GPS ankle monitor as a term of his parole. His parole officer granted him permission for visitation with J.C. and engagement in services. Referrals for parenting and domestic violence classes were made, and the psychological evaluation referral was sent to DCFS for approval on December 3, 2018. On December 20, 2018, the trial court ordered a psychological evaluation for Jerry. By February 2019, Jerry was consistently taking parenting classes; however, his psychological evaluation had not been performed, and he had not yet started domestic violence services.

¶ 8     On April 29, 2019, the trial court issued a dispositional order finding Jerry was unfit and unable to care for, protect, train, educate, supervise, or discipline his child and placement was contrary to the health, safety, and best interest of the child, because Jerry needed to complete recommended services including mental health and domestic violence. Custody and guardianship were placed with DCFS. The permanency order found Jerry made reasonable efforts toward returning the minor child home but had not made reasonable or substantial progress toward return, because he needed to evidence psychological stability sufficient to parent as well as other services.

¶ 9     In July 2019, developmental delays in J.C. were noted by the foster parent, and therapy was scheduled. Jerry completed his parenting class but was now incarcerated after violating the terms of his parole on June 4, 2019, the same day his psychological evaluation was scheduled. The parole violation was listed as noncompliance with the GPS ankle monitor. The August 29, 2019, permanency order found that Jerry had not made reasonable and substantial progress toward returning the minor home and had not made reasonable efforts toward returning the minor home.

¶ 10    By November 2019, J.C.'s developmental delays were more obvious. Although he was 18 months old, his language skills were at a 12-month level. He uttered sounds but did not say words. Jerry was advised of J.C.'s developmental issues and requested prison visitation but later agreed to postpone the visits until spring due to bad weather and the distance J.C. would have to travel. Visitation would be reevaluated in the spring of 2020. Jerry was taking anger management courses while incarcerated, and his projected release date was February 24, 2021.

¶ 11    In April 2020, it was reported that J.C. was attempting to use verbal language. By July 2020, J.C. was beginning to "muffle" words that the foster mother understood. By September 2020, J.C. was playing and bonding well in his foster home. Jerry had no visitation with J.C. since his reincarceration, originally due to weather, but now due to COVID. In November 2020, genetic testing on J.C. confirmed developmental delay, and a gene was identified that predisposed J.C. to blindness and deafness. J.C. was receiving increased therapy as a result of the genetic testing. Jerry's projected discharge date was November 23, 2020.

¶ 12    A permanency review hearing was held on November 6, 2020. At that time, Amy Fellers, the caseworker for DCFS, testified that Jerry was due to be paroled in a couple weeks and that he completed a parenting class in prison. She stated Jerry needed to complete his psychological evaluation and possibly other things upon release. He expressed a willingness to engage in services. Ms. Tellers confirmed that visitation would be reinstated upon Jerry's release and Jerry's last visitation with J.C. was in 2019 prior to his reincarceration.

¶ 13    Jerry also testified and confirmed that he was currently incarcerated at Robinson Correctional Center and had been there for 16 months. He stated his reincarceration was due to his failure to charge his ankle monitoring bracelet in violation of his parole. While incarcerated, he participated in a parenting class. He stated that he was not able to participate in domestic violence

services or visitation while incarcerated due to COVID. He advised the court that upon his release he would reside with his father until he could get a place of his own. He further advised that he was willing to get the psychological evaluation and participate in the parenting and domestic violence classes upon his release.

¶ 14    Following the testimony, the trial court found that Jerry made some effort, but the efforts were not reasonable. The court further found that Jerry had not made reasonable and substantial progress towards returning his child home. The court stated that, in order to justify such findings, Jerry needed to be released from custody, evidence psychological stability sufficient to parent his special needs child, visit with his child, and complete parenting education, a psychological evaluation and treatment recommendations, and domestic violence education.

¶ 15    On November 30, 2020, the State filed a petition to terminate Jerry and Haley's parental rights. The petition alleged that Jerry was unfit because: (a) he failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)); (b) he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child within the nine-month period from February 25, 2020, to November 25, 2020, after an adjudication of neglect, abuse, or dependency pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)); (c) he failed to make reasonable progress toward the return of the child within the nine-month period from February 25, 2020, to November 25, 2020, after an adjudication of neglect, abuse, or dependency pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)); and (d) he was depraved pursuant to section 1(D)(i) of the Adoption Act (*id.* § 1(D)(i)). The matter was set for hearing on March 11, 2021, but was continued to May 27, 2021, due to Jerry's injury following a motorcycle accident after his release from prison.

¶ 16    On May 27, 2021, Haley surrendered her parental rights in a specific consent directed to J.C.'s foster mother. Thereafter, the hearing as to Jerry's fitness was initiated, at which time Jerry's attorney requested a continuance to allow Jerry time to complete the psychological evaluation, which was scheduled for August 4, 2021. After considering objections from the State and the guardian *ad litem*, the trial court denied the motion.

¶ 17    The State called DCFS caseworker Amy Fellers who confirmed that Jerry's services involved parenting and domestic violence services as well as a psychological evaluation. She stated that Jerry was reincarcerated on June 4, 2019, the same day the psychological evaluation was scheduled, due to a parole violation involving his GPS monitoring ankle bracelet. The State requested the court take judicial notice of the original Class 4 felony conviction on January 2, 2018, in case No. 17-CF-150 for violation of an order of protection as well as the July 16, 2018, Class 4 felony conviction in case No. 18-CF-235, for violation of an order of protection. No objection was raised, and the court stated it would take judicial notice of its records.

¶ 18    Ms. Fellers confirmed that Jerry was out on parole from January 4, 2019, to June 4, 2019. She stated that Jerry engaged in and completed the required parenting services prior to his reincarceration. Ms. Fellers further confirmed that Jerry never engaged in domestic violence services while he was out on parole. She agreed that Jerry's prior convictions for domestic violence were serious concerns in this case and a primary impediment to having J.C. returned. She testified that Jerry was referred for domestic violence services upon his release in November 2020, but Jerry advised her that his paperwork had not been received. Ms. Fellers stated she resubmitted the referral and confirmed receipt from the facility, but Jerry told her that he had not yet been called to initiate services.

¶ 19   Ms. Fellers testified that Jerry's housing and employment were also concerns. His housing was never viewed by the agency because he never completed his services. She explained that safety checks were performed when the child was close to a return home. Ms. Fellers testified that Jerry was never employed and received Social Security Income (SSI) disability due to his level of functioning. Ms. Fellers opined that Jerry did not receive enough funds through SSI to appropriately care for his child but agreed on cross-examination that Jerry's income would be increased by government benefits provided for J.C. She explained that J.C. was a special needs child with developmental delays who received speech and developmental therapy both during and outside of school.

¶ 20   Ms. Fellers also addressed the difficulties associated with scheduling and obtaining psychological evaluations, explaining that the referrals were only good for limited periods of time. Once the period elapsed, the agency had to restart the referral process. Jerry's first psychological evaluation was scheduled for June 4, 2019. That appointment was canceled due to his reincarceration following the parole violation. Upon release, a second psychological evaluation was scheduled for May 23, 2021. However, Jerry's injuries following his motorcycle accident prevented him from attending that appointment because the evaluator's office was not on the first floor and no elevator was available to accommodate his wheelchair. The current evaluation was scheduled for August 4, 2021. Ms. Fellers confirmed that it was not possible to have the evaluation completed while Jerry was incarcerated.

¶ 21   Ms. Fellers testified that Jerry's visitation was originally scheduled for one hour a week, and he engaged regularly in those visits. She stated there were times Jerry was late due to transportation issues, but for the most part, he attended and rarely missed. She stated the visits went fairly well, but Jerry occasionally needed encouragement to engage with J.C. She confirmed

that Jerry did not have any visitation with J.C. while he was incarcerated, initially due to weather and transportation issues, and later due to COVID restrictions. Upon his release, Jerry was provided biweekly visitations and was compliant with those visits. He had some difficulty remembering when and where they were, but now he wrote it down to lessen the confusion.

¶ 22    Ms. Fellers opined that J.C. was no closer to a return home now that when she took over the case in January 2019. This was due to Jerry's inability to complete his services, his inability to financially support J.C., and the lack of living space for J.C. at Jerry's current residence. She confirmed that Jerry was exploring options for a larger living space.

¶ 23    Upon questioning by the court, Ms. Fellers confirmed that the purpose of the psychological evaluation was to determine Jerry's capacity. She stated that, to her knowledge, Jerry had no mental health treatment after the case was opened, had no regular mental health provider and was unsure of any psychiatric medications that Jerry might be taking. She confirmed that Jerry never attended any of J.C.'s medical appointments or school appointments but clarified that J.C. only recently started school. She did not believe Jerry understood J.C.'s developmental delays, what services J.C. might need, or the amount of attention J.C. might require for his condition. As to the domestic violence services, Ms. Fellers did not know how many times Jerry contacted the facility but stated based on her experience dealing with the facility, if the referral was made in December 2020, he would already be engaged in those services. With regard to visitation, Ms. Fellers explained that her use of the term "fairly well" was in terms of Jerry trying to keep J.C. engaged and paying attention. She did not think Jerry always understood what J.C. needed at the moment due to J.C.'s developmental delays and lack of verbal communication. Sometimes Jerry would be on his phone instead of one-on-one with J.C. Following Ms. Fellers's testimony, the State rested and advised the court that it was only proceeding on two of the counts alleged in the petition:

8

(a) failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)); and (c) failure to make reasonable progress toward the return of the child from February 25, 2020, to November 25, 2020, after an adjudication of neglect, abuse, or dependency pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)).

¶ 24 The defense called Jerry who confirmed that he lived with two other adults and his brother. He did not know of any caseworker who visited the home. He stated that he received $798 monthly in SSI because he was a slow learner and had a learning disability. He was looking for work, but that process was delayed after he fractured his leg in March 2021. He expected a complete recovery and stated that the injury would not interfere with finding employment or the August 4, 2021, psychological evaluation. He also testified about his difficulties starting his domestic violence services after two referrals following his release due to the facility's failure to return his calls. His testimony regarding the frequencies of his phone calls to the facility ranged from calling once, to about seven times, to calling once almost every day.

¶ 25 With regard to the psychological evaluation, Jerry stated that while on parole he had an ankle monitor. He stated he would call for movement, but his requests were denied despite telling them that he had to do things because of his court case. He then stated, "That's the reason I chose to go back to prison to finish out my time, because I wasn't able to be there for my son. I was on the ankle monitor [and] couldn't hardly get movement." He also stated that he was having problems keeping the ankle monitor charged. His violation was because the ankle monitor was not charged, and they were unable to contact him because they called at 3 a.m. when he was asleep. Jerry's parole officer did not want to give Jerry a parole violation. Jerry told him, "I just want to

go back to finish out my time." He confirmed his return to prison was voluntary. He was initially assigned to Stateville Correctional Center and later transferred to Robinson Correctional Center.

¶ 26    Jerry testified that anger management, parenting and domestic violence services were available to him at Robinson. He stated that he requested participation in domestic violence classes and anger management classes but was unable to do so due to COVID. The only class he was able to complete concerned how to be a parenting father figure. Jerry stated that he did not have in-person visitation while incarcerated due to COVID. He stated video visits were available, and he did not understand why he was not allowed video visitation. Jerry testified that he kept in contact with his caseworker and asked about J.C. while incarcerated. He sent J.C. a Christmas gift and meant to send a birthday present. Jerry was released from prison on November 23, 2020.

¶ 27    Jerry testified that he was willing to participate in the psychological evaluation. Before he went to prison, he had visitation every week with J.C., and Jerry opined that the visits went well. He would sit on the floor with J.C., play with toys with him, hold him, and feed him. When Jerry was released, he resumed visitation. The visits were one hour, and he attended all the visits except when he broke his leg. He stated he was never informed about any appointments for J.C. but would be willing to attend if he was aware of the appointment. Jerry confirmed that he received $798 monthly in SSI. He never paid child support and confirmed he was currently in a relationship with Haley.

¶ 28    The court questioned Jerry about the periods he was in custody. Jerry confirmed that he was charged in late April 2018 and was held in Danville from May 2018 until July 2018, when he accepted a plea offer for 18 months in IDOC and entered IDOC later that month. He was released on parole on November 13, 2018, and returned to IDOC, by his own choice, on June 4, 2019, because he got tired of calling in for movement and being denied. He confirmed that he was given

a choice to either go back to IDOC and finish his time or get reinstated for parole and he chose reincarceration.

¶ 29    Following testimony, the parties requested submission of written closing argument and the case was set for status and permanency review on August 25, 2021. Reports submitted with the court on August 20, 2021, revealed that J.C. was in excellent health and appeared well bonded to his foster family. He was enrolled in summer school Monday through Thursday in the mornings. He continued to be unable to speak words beyond "hi." When he was distressed, he would whine or act out because he was unable to communicate feelings in other ways. The foster mother confirmed she was willing to provide permanency through adoption of J.C. and stated J.C. was clingy when he returned from his weekly visits with Jerry. J.C. continued to receive weekly speech and developmental therapies. He enjoyed school and his peers. The reports further noted that Jerry was not enrolled in any services, including domestic violence. During visitation, he would watch videos on his cell phone and did not bring activities or toys for J.C. to interact with him. Nor did he bring diapers or snacks for J.C.'s visitations. It was reported that Jerry spent "a lot of his time during these visits texting or responding to text messages on his phone" and J.C. was able to verbalize to Jerry that he loved him. The report noted that Jerry showed minimal progress in his ability to parent J.C. without guidance and did "not demonstrate the skills to independently parent."

¶ 30    The case proceeded to a status hearing on August 25, 2021. The court asked about the status of the August 23, 2021, psychological evaluation and was advised that it was performed. The court on its own motion reopened the evidence and stated it would accept the psychological evaluation report when it was completed and directed the State to file the report with the court. The case was set for a status hearing on October 22, 2021. The psychological evaluation report was filed with the court on August 27, 2021. At the October 22, 2021, status hearing, Jerry's attorney requested

11

the court not consider the psychological evaluation report as evidence. The State did not object and the court advised the parties that it would not consider the report.

¶ 31    The matter was set for hearing on January 14, 2022, at which time the trial court issued its ruling on fitness. The court restated the grounds alleged by the State and the court's required considerations for each ground. The court noted that the case was opened due to past domestic violence occurrences, there was no visitation during incarceration, Jerry's living arrangements were inadequate, and Jerry was not employed.

¶ 32    The court then addressed the referrals for parenting education and domestic violence services as well as a psychological evaluation, noting that Jerry completed parenting education in April 2019 prior to his reincarceration and he completed a program while incarcerated. The court also noted that Jerry was referred for domestic violence services in December 2018 but did not engage in services subsequent to his return to custody in June 2019, was re-referred for domestic violence services in December 2020 after his most recent release, and had not engaged in services, stating, "The Court does not find that father's efforts to connect with the service provider is represented to be credible nor his efforts in that regard reasonable." With regard to the psychological evaluation, the court noted that the referral was initially set for June 4, 2019, which was the day the Jerry went back into custody for the parole violation, and stated, "He opted rather than to continue parole to return to the Department of Corrections to serve the balance of his term which he did resulting in about an 18-month period of incarceration ending [on] November 23 of 2020." The court noted that Jerry was again referred for a psychological evaluation and was unable to participate in the evaluation because the office was on the second floor of a building with no elevator and Jerry had a broken leg. He later did complete the evaluation.

12

¶ 33    The court found the State established, by clear and convincing evidence, Jerry's unfitness for failing to maintain a reasonable degree of interest, concern, or responsibility as to J.C.'s welfare. The evidence established that Jerry did engage in some efforts to correct the detrimental behavior that was the basis for the child's removal, but those efforts did not evidence a reasonable degree of interest, concern, and responsibility as to J.C.'s welfare. The court noted Jerry demonstrated an interest in J.C. as evidenced by consistent contact during visitation while he was not incarcerated and providing some gifts to the child while incarcerated. However, Jerry had not "participated in the most significant service which was necessary and designed to achieve reunification or correct the conditions which required this child to be in care, that being domestic violence services." While Jerry's conduct did demonstrate "some concern for the child," there was evidence that the child had special needs and Jerry's conduct did not include "inquiring about nor even speaking to the caseworker about those needs" or asking "how he might assist in addressing those needs. "Most significantly for purposes of this case the father's conduct has not demonstrated reasonable responsibility for the child." While Jerry timely completed parenting classes, "the underlying issue in this case was *** domestic violence and that has never been addressed." While the evidence did establish that Jerry demonstrated some degree of interest and concern for his child, the State established by clear and convincing evidence father's unfitness for failing to maintain a reasonable degree of interest, concern, and responsibility as to the child's welfare. The court did not question Jerry's love and affection for his child but found "he had not throughout the course of this case demonstrated a reasonable degree of interest, concern, and responsibility as to the child's welfare and needs."

¶ 34    The court also addressed the State's allegation that Jerry was unfit for failing to make reasonable progress toward the return of J.C. from February 25, 2020, to November 25, 2020. The

13

court noted the objective standard, as well as progress in a service plan, to evaluate this issue. The court found that the State established by clear and convincing evidence Jerry's unfitness for failing to make reasonable progress toward J.C.'s return during the designated period. The court found that with the exception of two days, Jerry was incarcerated for the entire period "by his own choice as a result of his inability or failure to keep the electronic monitoring device as a condition of his parole charged." The court noted that Jerry chose to return to prison rather than deal with having the electronic device. The court found this decision precluded Jerry's access to necessary services, including domestic violence services and the psychological evaluation and any services that might have been recommended by that evaluation. The court found that Jerry was "by his own choice no closer to the return of his child at the end of the designated period than he was at the beginning."

¶ 35    The court set the matter for a court best interest hearing on March 4, 2022. A best interest report filed was filed on March 3, 2022. The report revealed findings from a visit to Jerry's house where he still lived with his father, stepmother, and brother. The residence "was not clean." Trash was noted in living areas as well as Jerry's bedroom, and baby cockroaches were noted to be crawling across the floor. The report also noted that Jerry completed the intake for a domestic violence program at Crosspoint. Jerry's actions during visitation continued to revolve around his cell phone and little effort to engage J.C. in activities occurred.

¶ 36    As to J.C., the report noted a strong bond between J.C. and his foster parent. It was clear that J.C. was loved and received a lot of attention from the foster parent and other peers. The foster parent was willing to provide permanency for J.C. J.C. was attending prekindergarten, learning to share, and becoming more engaged with his peers, which was an improvement from his earlier behavior that indicated a preference to play alone and not share his toys. He continued to receive weekly speech and developmental therapies and showed improvement in verbalization instead of

14

finger-pointing, although he still had delays in his speech. The report indicated that J.C.'s physical safety and welfare, including food, shelter, health, and clothing, were met by the foster parent who would continue to meet those needs. He continued to develop his own identity while in his foster placement. He was placed with a licensed, specialized foster parent and resided with one of his siblings. He would continue to have visitation with his other sibling. J.C had an inseparable bond with his foster family and was happy in his foster placement.

¶ 37  The report noted that J.C. was too young to verbalize his sense of security, but his behaviors showed that he was safe and secure at his current foster placement. He was affectionate with the foster parent, often smiling, laughing, and feeling at ease with her. He appeared to feel at home in his current foster placement. He had a daily routine and was aware of when it was time to eat, complete hygiene, or go out in the community. The foster parent continued to be a loving caregiver to J.C., and he was very close with the foster family. The foster mother would ensure that once J.C. was old enough, his wishes and long-term goals would be met. He attended school and church and had strong ties with the foster mother's grandchildren. The report stated that his foster placement was stable, and permanency was needed in order for him to continue to grow and thrive. There was minimal risk associated with this substitute care, as J.C. had been with his foster mother and family since the case opening in May 2018. The foster mother wanted to adopt J.C. and provide permanency and the agency opined this was the best option for J.C. The report recommended a goal change from return home to adoption.

¶ 38  The best interest hearing was held on March 4, 2022. Ms. Fellers was the only witness, and she confirmed the facts in the best interest report. She stated that based on her observations, J.C. liked being in the foster home. J.C. took the bus to prekindergarten. He had speech therapy and

occupational therapy at Carle in Urbana via transport by the foster parent. He had attended all of his appointments and his therapy was ongoing. He did not have any health problems.

¶ 39 Ms. Fellers testified that Jerry missed several visits or was late to his visits since the last court date. She stated that Jerry missed visitation this week because he was sick, which was an appropriate excuse, but Jerry called 10 minutes before the visit, so J.C. had already been picked up from the foster placement. She was not aware of Jerry's planned move in the near future. With regard to Jerry's employment, she testified that he told her he had part-time employment but never showed proof of employment, so it was her understanding that he was just receiving SSI. She stated that Jerry did attend orientation for domestic violence services at Crosspoint, and this was the only remaining service requiring Jerry's participation.

¶ 40 In response to the court's questioning, Ms. Fellers stated that J.C. did refer to Jerry as dad and previously told him that he loved him. J.C. built some relationship with Jerry, but due to the inconsistencies with visits and his incarceration, there was a gap in establishing that relationship. She did not consider the bond to be a parent-child bond. J.C.'s bond with his foster parent involved attachment. He often wanted to be on her lap, engage her, and voluntarily hugged and kissed her. There was a lot of affection. It was "seemingly much different than his relationship with [Jerry]."

¶ 41 On cross-examination, Ms. Fellers was asked why she did not consider the relationship between J.C. and Jerry a parent-child bond, and she stated that the relationship seemed to be a surface relationship without a lot of engagement, as Jerry and J.C. did not typically engage in activities during visitation. Following Ms. Fellers's testimony, Jerry's attorney proffered to the court that Jerry was in the process of changing his residence and said residence would be appropriate for the return of the child.

16

¶ 42   Following argument, the trial court noted that J.C. was born in March 2018, the case was opened in May 2018, and he had been with his current specialized foster placement since the case opening, which was almost the entirety of his four years of life. The court took notice of the evidence presented at the unfitness stage as it pertained to issues of permanence and stability for the child and considered the testimony, the proffer by Jerry, and the best interest report filed with the court. The court noted that J.C.'s placement provided for his special needs, committed to permanency through adoption, and was with his brother. The court noted that J.C. was bonded, safe, and loved in that home.

¶ 43   Thereafter, the trial court stated:

"As this case has progressed *** the proffer today is consistent with the manner in which this case has progressed in that at every hearing, the father has not yet completed services and has plans to make some change in his personal life that will correct a deficiency that's hindering unification. It has been a four-year process of just one step away. And it's really simply resulted in not being any closer to unification than we were at the beginning of the case."

¶ 44   Balancing the evidence presented, the court found the State established by a preponderance of the evidence that it was in the best interest of the child and the public that Jerry's parental rights be terminated and the Guardianship Administrator of DCFS be appointed guardian and custodian of the child with the power to consent to his adoption. The court considered all of the statutory factors in making its determination. The order was filed on March 7, 2022. Jerry timely appealed.

¶ 45                              II. ANALYSIS

¶ 46   Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)).

17

After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental right termination. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is unfit under one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *Id.* §§ 2-29(2), (4).

¶ 47    On appeal, Jerry argues that the trial court's finding of unfitness pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) was erroneous, and the trial court's finding that it was in J.C.'s best interest to terminate Jerry's parental rights was against the manifest weight of the evidence. However, no argument was raised or presented as to the trial court's finding of unfitness pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)) for the period from February 20, 2020, to November 25, 2020.

¶ 48    "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). "This means that, on review, if there is sufficient evidence to satisfy any one statutory ground we need not consider other findings of parental unfitness." *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). By failing to argue that the trial court's finding of unfitness pursuant to section 1(D)(m)(ii) was in error, we have no choice but to affirm that trial court's finding of unfitness. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."); *In re R.S.*, 382 Ill. App. 3d 453, 464 (2008) (failure to argue issue in brief results in forfeiture of the issue on appeal).

¶ 49    Once a parent is found unfit, the "issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Therefore, we shall only address the trial court's best interest finding.

¶ 50    Here Jerry contends that the trial court's finding that it was in the best interest of J.C. to terminate his parental rights was against the manifest weight of the evidence. In support, Jerry contends that he maintained a continued interest in J.C. but, due to his incarceration, was unable to participate in services. He also contends that J.C. loved Jerry, and the trial court should have given him more time to complete services and have more visits with J.C. to strengthen their bond.

¶ 51    The trial court considers numerous statutory factors in making the best interest determination. 705 ILCS 405/1-3(4.05) (West 2020). These factors include (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the people available to care for the child. *Id.* "The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being." *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 30.

¶ 52    There is no dispute that "[p]arental rights and responsibilities are of deep human importance and will not be lightly terminated." *Paul v. Steele*, 101 Ill. 2d 345, 351-52 (1984). However, Jerry's contention that the trial court should have granted him more time to complete his services has little relevance for the best interest issue, which is based on the best interest of the child. As noted by the trial court, Jerry's failure to complete his services due to incarceration was based on Jerry's choice to return to IDOC instead of continuing his parole with the GPS monitoring ankle bracelet, the latter of which would have allowed Jerry to complete his services.

¶ 53    Additionally, the bond between Jerry and J.C. is but one factor for consideration. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield

19

to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. Here, the evidence revealed that J.C. resided with the foster parent for all but two months of his four-year life. During that time, J.C.'s bond with the foster parent was nourished and deepened into something more than the "surface relationship" between J.C. and Jerry. Jerry's failure to interact with J.C. during visitation, choosing instead to focus on sending and responding messages on his cell phone, is further evidence of the resulting lack of attachment between Jerry and J.C.

¶ 54    As to J.C.'s physical safety and welfare, there was no dispute that J.C. had developmental delays and needs that were being addressed and met by the foster parent. Conversely, no evidence was submitted revealing that Jerry comprehended the extent of J.C.'s developmental delays or the additional efforts required to assist him with that condition. Instead, Jerry's only acknowledgment of J.C.'s delays revealed Jerry's intent to rely on the additional financial subsidies related to J.C.'s disabilities in order to increase his own monthly income. The remaining evidence, contained in the best interest report and Ms. Fellers's testimony, addressed the remaining statutory factors and supported termination of Jerry's parental rights. No contradictory evidence, beyond Jerry's proffer of finding a new residence, was presented.

¶ 55    "The court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent [citation], and it abuses its discretion only when it acts arbitrarily without conscientious judgment [citation]." *In re Tajannah O*., 2014 IL App (1st) 133119, ¶ 20. Given the evidence in this case, no such finding can be made, and therefore, we affirm the trial court's finding that it was in J.C.'s best interest to terminate Jerry's parental rights.

¶ 56                                    III. CONCLUSION

¶ 57    For the reasons stated herein, we affirm the trial court's findings of unfitness and that it was in the best interest of J.C. to terminate Jerry's parental rights.

20

¶ 58    Affirmed.